Jack R. HOLLAND, George E. Rush, Truman Manning and Henry D. Zobell, Plaintiffs,

v.

The AMALGAMATED SUGAR COMPA-NY, the Amalgamated Sugar Company Retirement Plan Committee, Harold Simmons and John Does 1–10, Defendants.

Civ. No. 87–C–968G.

United States District Court, D. Utah, C.D.

Jan. 13, 1992.

 

David R. Olsen, Fred R. Silvester, Salt Lake City, Utah, for plaintiffs.

Jean Reed Haynes, New York City, James S. Jardine, Salt Lake City, Utah, for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

J. THOMAS GREENE, District Judge.

The above entitled action came on regularly for trial before the court sitting without a jury on July 8–11 and 22, 1991. Fred R. Silvester and Claudia F. Berry appeared as counsel for plaintiff and Jean Reed

Haynes, Thomas E. Dutton and James S. Jardine appeared as counsel for defendants. Having heard the testimony, examined the other evidence adduced by the respective parties, and heard the arguments of counsel, and this cause having been submitted for decision, the Court now makes and enters its Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

### I. NATURE OF THE PROCEEDINGS AND JURISDICTIONAL FACTS

1. This litigation arises out of the spinoff of the Amalgamated Sugar Company Retirement Plan for Non–Bargaining Employees and the subsequent reversion of almost all of the Plan's residual assets to The Amalgamated Sugar Company. The plaintiff class is challenging both Amalgamated's right to that reversion and the manner in which Amalgamated determined the amount of reversion. Plaintiffs' suit is brought under the Employee Retirement Income Security Act ("ERISA") of 1974, as amended, 29 U.S.C. §§ 1001, et seq.

### II. PARTIES

2. Defendant The Amalgamated Sugar Company ("Amalgamated") is a Utah corporation with its principal place of business in Ogden, Utah. Amalgamated is engaged in the production and sale of refined sugar and by-products from sugar beets. Amalgamated is a wholly-owned subsidiary of Valhi, Inc.

3. Valhi, Inc. ("Valhi") is a Delaware corporation with its principal place of business in Dallas, Texas. Valhi is the surviving entity resulting from the March 1987 merger of Amalgamated Sugar into LLC Corporation. Approximately 90% of Valhi's outstanding common stock is held directly or through subsidiaries by Contran Corporation ("Contran"). All of Contran's outstanding common stock is held by a trust established by Harold C. Simmons for the benefit of his children and grandchildren, of which Mr. Simmons is sole trustee. Following the Amalgamated/LLC Corpora-

tion merger, Valhi contributed its existing refined sugar operation to a newly formed, wholly-owned subsidiary called The Amalgamated Sugar Company. Valhi was dismissed as a party in this litigation during the course of the trial.

4. Defendant The Amalgamated Sugar Company Retirement Plan Committee ("the Committee") was the named administrative entity of the Amalgamated Sugar Company Retirement Plan for Non–Bargaining Employees.

5. Defendant Harold C. Simmons became Trustee of the Trust that had held the assets of the Amalgamated Sugar Company Retirement Plan for Non–Bargaining Employees in January 1983. Mr. Simmons is the Chairman of the Board of Amalgamated as well as Chairman of the Board of Valhi and Contran, and is the beneficial owner of most of the stock and is in control of each of these companies.

6. Plaintiffs represent a certified class comprised of 157 individuals. The class was defined in this Court's January 31, 1989 Memorandum Decision and Order as follows:

> All individuals who received and/or are receiving pension benefits (including former employees of the Amalgamated Sugar Co. and/or the designated survivors, if any, of such retired employees) under the Amalgamated Sugar Company Retirement Plan for Retired Non–Bargaining Employees as of the effective date of that Plan, August 11, 1986.

### III. THE 1953 PLAN

7. Effective October 1, 1953, The Amalgamated Sugar Company Retirement Plan, hereinafter referred to as the "1953 Plan" was established. At the same time, Amalgamated established the Amalgamated Retirement Trust to fund benefits under the 1953 Plan.[1]

8. The 1953 Plan was a defined benefit plan, was qualified for preferential tax status under Section 165 of the Internal Revenue Code and was funded through contributions by participants and by Amalgamat-

---

1. Effective April 1, 1942, a preexisting plan had   been established by Amalgamated.

ed. Participants contributed a fixed rate of their monthly earnings by way of payroll deductions according to the Plan's formula. The amount of contributions by employees who were eligible for membership in the 1953 Plan and who chose to become members was based on a percentage of that member's monthly salary. Amalgamated contributed the amount necessary, based upon yearly actuarial valuations, to fund fully the benefit obligations of the Plan. This was in addition to participant contributions.

9. The majority of funds contributed by Amalgamated were contributed pursuant to Section 18.4 of the 1953 Plan which provided that

> [d]uring the continuance of this Plan, Amalgamated shall from time to time pay to the Trustee to be held under the Trust such sums of money as Amalgamated shall approve for the purpose of providing the benefits under the Plan.

The amount of Amalgamated's contribution to the 1953 Plan was determined each year by Amalgamated's Board of Directors and was based upon a range recommended by Amalgamated's actuaries about the expected requirements of the Plan. *

10. Section 13.2 of the 1953 Plan provided:

> *No amendment of the Plan shall operate retroactively* so as to affect adversely any retirement incomes theretofore granted under this Plan or under any Trust that may be established to effectuate and implement this Plan, *or to prejudice, impair or adversely affect any right of any member acquired by or vested in him* under the provisions of this Plan prior to any such action by the Company, *unless otherwise consented to by not less than 75% of all the members then in the Plan;* except, however, any modification or amendment of the Plan may be made retroactively, as necessary and appropriate, to qualify and maintain the Plan as plan and trust meeting the requirements of Section 165(a) and 23(p)

of the Internal Revenue Code as now in effect or hereafter amended, or any other applicable provisions of the Federal Tax Laws, as now in effect or hereafter amended or adopted, and the regulations issued thereunder. (Emphasis added).

11. Amalgamated never submitted any amendment to the 1953 Plan or subsequent plans to plan members for their vote and approval.

12. Section 14 of the 1953 Plan provided:

> If *after satisfaction of all liabilities* with respect to members, retired members, former members and joint annuitants under the Plan, there is a balance remaining *due to erroneous actuarial computation,* the balance shall be paid by the Trustee to the Company. (Emphasis added.)

## IV. THE 1970 PLAN

13. Effective October 1, 1970, Amalgamated amended the 1953 Plan to form the Amalgamated Sugar Company Retirement Plan (Non–Bargaining Employees) (the "1970 Plan").

14. The 1970 Plan covered only salaried employees,[2] was a defined benefit plan, was qualified for preferential tax status under Section 401(a) of the Internal Revenue Code and was funded by contributions from participants and from Amalgamated.

15. Participants contributed a fixed rate of their monthly earnings by way of payroll deductions according to the Plan's formula. Amalgamated contributed the amount necessary, based upon yearly actuarial valuations, to fund fully the benefit obligations of the Plan. This was in addition to participant contributions.

16. The amount of Amalgamated's contributions to the 1970 Plan was determined each year by Amalgamated's Board of Directors and was based upon a range recommended by Amalgamated's actuaries about the expected requirements of the Plan.

---

2. In 1969, Amalgamated had created a separate plan for its hourly production employees (the "Hourly Plan") by "spinning off" hourly employees from the 1953 Plan. The Hourly Plan is not at issue in the action now before the Court.

17. Amendments to the 1953 Plan created under the 1970 Plan amendments included the following:

a. An amendment provision of the 1970 Plan which was different from that of the 1953 Plan. The 1970 Plan deleted Section 13.2 of the 1953 Plan which related to required consent of Plan participants, and substituted the following:

The Company hopes and expects to continue the Plan indefinitely, but nevertheless reserves the right to amend, modify, suspend or terminate the Plan by action of its Board of Directors provided, however, no such action shall alter the Plan or its operation with respect to participants who shall have retired under this Plan or any preceding plan, and rights of participants are non-forfeitable to the extent then funded.

(1970 Plan § 17.1).

b. A reversion provision which was different from that of the 1953 Plan. The 1970 Plan deleted Section 14.4 of the 1953 Plan which related to Amalgamated's right to a reversion upon termination of the Plan, and substituted the following:

Notwithstanding the foregoing provision, but only after all liabilities of the Plan have been satisfied, the Company shall be entitled to any balance of the fund which shall remain and which shall be due to erroneous actuarial calculations.

(1970 Plan § 17.3).

c. Benefit provisions under the 1970 Plan which were different from those set forth in the 1953 Plan. While the benefits earned for each year of service under the 1953 Plan were determined by a percentage of the participant's salary in that year of service, benefits earned under the 1970 Plan were determined, for each year of service, based upon the participant's average salary for the five highest years in the last ten years before retirement. Benefits earned under the 1970 Plan for each month of service were offset by a percentage— 1.25%—of each participant's primary Social Security benefit. (Social Security offset provision)

18. Prior to October 1, 1970, the interest rate credited to employee contributions was 2%.

V. THE 1976 PLAN

19. Effective October 1, 1976, Amalgamated amended and restated The Amalgamated Sugar Company Retirement Plan for Non–Bargaining Employees (the "1976 Plan") to comply with certain provisions of ERISA.

20. The 1976 Plan was a defined benefit plan, was qualified for preferential tax status under section 401(a) of the Internal Revenue Code, and was funded by contributions from participants or from Amalgamated. Participants contributed a fixed rate of their monthly earnings according to the Plan's formula. Amalgamated contributed the amount necessary, based upon yearly actuarial valuations, to fund fully the benefits of the Plan. This was in addition to participant contributions.

21. The amount of Amalgamated's contributions to the 1976 Plan was determined each year by Amalgamated's Board of Directors and was based upon a range recommended by Amalgamated's actuaries about the expected requirements of the Plan.

22. Amendments to previous plans created under the 1976 Plan included the following:

a. The 1976 Plan changed the language of Section 14.4 of the 1953 Plan and Section 17.3 of the 1970 Plan relating to reversion to Amalgamated of residual assets due to "erroneous actuarial computation" by eliminating that requirement altogether, substituting the following:

After all liabilities of the Plan have been satisfied, the Employer shall be entitled to any balance of the Fund which shall remain. (1976 Plan § 16.03.)

b. The Social Security offset provision which had been adopted in the 1970 Plan was eliminated.

c. The benefit accrual formula under the 1976 Plan provided participants with more retirement income. Also, unreduced early retirement benefits and disability

benefits were made available to certain qualified participants.

## VI. THE 1980 AMENDMENT

23. Effective October 1, 1980, Amalgamated amended the 1976 Plan.

24. Amendments to prior plans created under the 1980 Plan included the following:

a. A Social Security offset, somewhat similar to what went into effect under the 1970 Plan, was adopted. The benefit formula was adjusted so that the participants' benefits were reduced by Social Security benefits which otherwise they were entitled to receive. Benefits earned by ongoing Plan participants for future service, accrued by Plan participants after October 1, 1980, were to be offset at the rate of 1.471% of the participant's primary social security benefit for each year of credited service after October 1, 1980. (1980 Amendment, § 4.01(b)(iii)). Benefits earned for past services, those that had accrued prior to October 1, 1980, were not changed, so that participants who retired prior to October 1, 1980 received their entire accrued benefit under the 1976 Plan, without any Social Security offset.

b. Employee contributions after February 1, 1981, were eliminated, which made the Plan non-contributory.

c. All participants who were active employees of Amalgamated as of October 1, 1980, received a refund of all prior contributions to the Plan, plus interest at the Plan rate. Prior to the refund of employee contributions, the actual rate of earnings on all Plan assets exceeded the Plan rate of interest.

25. Participants under the 1976 Plan who had retired prior to October 1, 1980, did not receive a refund of their contributions. This group included individuals such as plaintiff Jack R. Holland who had retired on September 30, 1980. 45 Participants (or their beneficiaries) of the 157 individuals in the certified class received a refund of employee contributions, with interest at the Plan rate, pursuant to the 1980 Amendment. These 45 participants/beneficiaries received a total of $536,746.17.

26. The 1980 Amendment was enacted by Amalgamated to reduce costs to Amalgamated, to give Amalgamated employees a non-contributory plan, and to provide prospective retirees with post-retirement benefits more in line with what Amalgamated's competitors were providing.

## VII. SURPLUS IN AND AFTER 1981

27. On October 1, 1981, after Amalgamated had returned employee contributions pursuant to the 1980 Amendment, the 1976 Plan became 100% funded in that the value of the Plan's assets essentially equalled the present value of the Plan's accrued benefits ("PVAB"). After 1981, a "surplus" developed in the plan, i.e., the Plan's assets were greater than PVAB.

28. The surplus in Amalgamated's pension plan arose after October 1, 1981 primarily because of two factors: (1) higher than expected return on investment of all plan assets, and (2) a change in the interest rate assumptions adopted by Amalgamated's actuary.

29. Returns on investment of plan assets amounted to 12.73% in 1982, 37.70% in 1983 and 19.82% in 1986. Even though Amalgamated did not contribute any money to the Plan in 1983, the ratio of asset value to PVAB went from 125% to 143% in that year. This accounted for most of the surplus in the pension plan.

30. In 1982, Amalgamated's actuary changed the assumed rate of return from 7% to 8.5%. The increase in the assumed rate of return created a surplus because benefit obligations are determined on a present value basis. The change from 7% to 8.5% decreased PVAB, and in turn, increased the difference between the value of the Plan's assets and PVAB. This accounted for most of the remainder of the surplus.

## VIII. THE 1986 RETIREES' PLAN— SPIN–OFF TERMINATION

31. The 1976 Plan as amended remained in effect until June 30, 1986, when two

separate plans were formed. Effective July 1, 1986, the 1976 Plan was split into two plans, the Retirees' Plan and the Continuing Salaried Plan also sometimes referred to as the Ongoing Plan.

32. The creation of the two plans was accomplished in order to implement what is known as a "spin-off termination." [3] The sole purpose of the spin-off termination was to enable Amalgamated as the employer to recoup "excess assets."

33. The Continuing Salaried Plan covered, and continues to cover, active participants and deferred vested participants and their beneficiaries who were not receiving pension benefits as of July 1, 1986.

34. Amalgamated purchased an annuity contract to cover accrued benefit liabilities to participants in the Continuing Salaried Plan actuarially calculated on termination basis, even though that Plan continued in effect. The annuity contract was purchased from Pacific Mutual Life Insurance Company for $7,745,300.00.

35. As part of the spin-off of the Retirees' Plan, the benefit liabilities to retired participants in the 1976 Plan and all assets in excess of those required to purchase the annuity for the Continuing Salaried Plan participants' accrued benefits were allocated to the new Retirees' Plan.

36. The Retirees' Plan covered, and continues to cover, former participants in the 1976 Plan (and their beneficiaries) who were receiving retirement benefits under the 1976 Plan as of July 1, 1986. Section 16.03 of the Retirees' Plan, in language identical to that of the 1976 Plan, provided Amalgamated with the right of reversion:

> After all liabilities of the Plan have been satisfied, the Employer shall be entitled to any balance of the fund which shall remain. (1986 Plan § 16.03.)

37. Effective August 11, 1986, the Retirees' Plan was terminated. The termination amendment provided that the participants' share of surplus plan assets would be determined by applicable regulations. The Continuing Salaried Plan, or Ongoing Plan, was also amended so that any participants in the Ongoing Plan who would have been entitled to a portion of surplus assets if the entire plan had terminated also received a portion of the surplus.

38. The value of plan assets in the 1976 Plan as of December 1, 1986, was $21,594,005.00.

39. Amalgamated purchased a second annuity contract from Pacific Mutual Life Insurance Company for $8,472,200.00 to satisfy the accrued benefit obligations of the Retirees' Plan.

40. Amalgamated made the determination that the fully vested and nonforfeitable accrued benefits, as of the date of termination, for both Retiree Plan participants and Ongoing Plan participants, were satisfied by purchasing the two annuity contracts. All assets in excess of those needed to purchase annuities, approximately $13,848,705.00 were transferred to the new Retirees' Plan, and an unfunded liability or $2,626,723.00 of the Ongoing Plan was also transferred to the new Retirees' Plan.

41. The "residual assets," which consisted of the difference between the total assets in the Retirees' Plan and the purchase price of the annuity contract for the Retirees' Plan, amounted to $5,376,505.00.

## IX. DETERMINATION OF AMALGAMATED'S REVERSION—"THE PRESUMPTIVE METHOD"

43. Contributions to the Retirees' Plan (and all its predecessors since inception of the 1953 Plan) by Amalgamated and by Plan participants for Plan years ending September 30, 1953 through September 30, 1986, were calculated by Amalgamated to be as follows:

| Plan Year End | Amalgamated Contributions | Participant Contributions |
|---|---|---|
| 9/30/53 | $ 50,485.60 | $ 0 |
| 9/30/54 | 143,418.60 | 66,775.52 |
| 9/30/55 | 155,603.89 | 70,031.23 |

---

3. The spin-off termination in this case involved both hourly and salaried employees, but the Hourly or Bargaining Employees' Plan is not at issue in the action now before the Court.

| Plan Year End | Amalgamated Contributions | Participant Contributions |
|---|---|---|
| 9/30/56 | $ 145,000.00 | $ 72,947.00 |
| 9/30/57 | 144,552.00 | 77,866.26 |
| 9/30/58 | 172,176.00 | 82,363.98 |
| 9/30/59 | 159,654.00 | 89,607.88 |
| 9/29/60 | 208,901.00 | 103,678.00 |
| 9/29/61 | 177,432.00 | 109,130.34 |
| 9/29/62 | 143,532.00 | 115,222.27 |
| 9/29/63 | 112,668.00 | 124,425.40 |
| 9/29/64 | 0 | 132,085.00 |
| 9/30/65 | 0 | 137,713.38 |
| 9/30/66 | 0 | 164,211.00 |
| 9/30/67 | 0 | 146,540.27 |
| 9/30/68 | 0 | 150,900.88 |
| 9/30/69 | 0 | 160,982.00 |
| 9/30/70 | 0 | 84,585.00 |
| 9/30/71 | 0 | 88,836.00 |
| 9/30/72 | 186,607.00 | 121,917.00 |
| 9/30/73 | 270,506.00 | 110.218.00 |
| 9/30/74 | 243,493.00 | 108,164.20 |
| 9/30/75 | 542,154.00 | 126,567.00 |
| 9/30/76 | 731,109.00 | 92,080.00 |
| 9/30/77 | 874,524.00 | 97,922.66 |
| 9/30/78 | 962,450.00 | 106,437.15 |
| 9/30/79 | 1,072,242.00 | 115,316.69 |
| 9/30/80 | 1,165,386.00 | 130,157.00 |
| 9/30/81 | 1,146,091.00 | 45,248.00 |
| 9/30/82 | 636,467.00 | 0 |
| 9/30/83 | 0 | 0 |
| 9/30/84 | 0 | 0 |
| 9/30/85 | 0 | 0 |
| 9/30/86 | 0 [4] | 0 |
| TOTALS | $9,443,452.09 | $3,031,839.11 |

| Plan Year | Estimated Plan Earnings Rate |
|---|---|
| 10/01/52 to 09/30/53 | 0.00% |
| 10/01/53 to 09/30/54 | 4.50% |
| 10/01/54 to 09/30/55 | 3.90% |
| 10/01/55 to 09/30/56 | 3.70% |
| 10/01/56 to 09/30/57 | 2.90% |
| 10/01/57 to 09/30/58 | 3.40% |
| 10/01/58 to 09/30/59 | 3.20% |
| 10/01/59 to 09/30/60 | 3.80% |
| 10/01/60 to 09/30/61 | 4.40% |
| 10/01/61 to 09/30/62 | 4.10% |
| 10/01/62 to 09/30/63 | 5.40% |
| 10/01/63 to 09/30/64 | − 1.40% |
| 10/01/64 to 09/30/65 | 14.10% |
| 10/01/65 to 09/30/66 | 9.50% |
| 10/01/66 to 09/30/67 | 7.30% |
| 10/01/67 to 09/30/68 | 4.40% |
| 10/01/68 to 09/30/69 | 8.00% |
| 10/01/69 to 09/30/70 | 12.40% |
| 10/01/70 to 09/30/71 | 8.90% |
| 10/01/71 to 09/30/72 | − 3.00% |
| 10/01/72 to 09/30/73 | 6.20% |
| 10/01/73 to 09/30/74 | 4.00% |
| 10/01/74 to 09/30/75 | 3.90% |
| 10/01/75 to 09/30/76 | 12.10% |
| 10/01/76 to 09/30/77 | 20.60% |
| 10/01/77 to 09/30/78 | 0.30% |
| 10/01/78 to 09/30/79 | 9.70% |
| 10/01/79 to 09/30/80 | 5.90% |
| 10/01/80 to 09/30/81 | 7.70% |
| 10/01/81 to 09/30/82 | 1.70% |
| 10/01/82 to 09/30/83 | 10.30% |
| 10/01/83 to 09/30/84 | 25.20% |
| 10/01/84 to 09/30/85 | 4.60% |
| 10/01/85 to 09/30/86 | 0.90% |

available in the records of Amalgamated and the Plans, were as follows:

44. The Plan interest rate, as set forth in the 1953 Plan, the 1970 Non–Bargaining Employees Plan, the 1976 Plan, and the Retirees' Plan was as follows:

a. Two percent per annum from October 1, 1953 through September 30, 1969 (1953 Plan at Section 9.5);

b. Four percent per annum from October 1, 1969 through September 30, 1976 (1976 Plan at Section 10.04); and

c. Five percent per annum from September 30, 1986 through July 1, 1986 (1976 Plan at Section 10.04).

45. The actual Plan earnings rate for the Retirees' Plan and predecessor Plans, that is, the actual rates of return experienced by the trust fund, as estimated by plaintiffs' experts from the information

46. Coopers & Lybrand, the accounting firm retained by Amalgamated in mid–1986 to implement the spin-off termination, was directed by Amalgamated to assume that no employee assets remained in the Retirees' Plan when it began work on the spin-off termination. Accordingly, when making its calculations, Coopers & Lybrand initially assumed that participants in the Retirees' Plan were not entitled to any portion of the residual assets.

47. Thereafter, Coopers & Lybrand performed a calculation in accordance with its interpretation of Pension Benefit Guarantee Corp. (PBGC) regulation § 2618.31(b) to determine the portion of the Plan's residual

---

**4.** Amalgamated contributed $187,003.00 in 1986 to the Continuing Salaried Plan after termination of the Retirees' Plan. This amount is not included as an Amalgamated contribution to the Retirees' Plan.

assets which were attributable to mandatory employee contributions. This was done pursuant to the so-called "presumptive method" set forth at 29 C.F.R. § 2618.-31(b).

48. Pursuant to the "presumptive method," the total amount of residual assets is multiplied by a fraction:

a. The numerator of which is the present value of all benefits assigned to priority category 2, which constitute benefits attributable to mandatory employee contributions, pursuant to PBGC Regulation § 2618.12; and

b. The denominator of which is the present value of all benefits assigned to priority categories 2 through 6, which constitutes all plan benefits, pursuant to PBGC Regulations §§ 2618.12 through 2618.16.

49. Coopers & Lybrand performed the presumptive method calculation as if the entire plan had terminated in order to account for and distribute any residual assets attributable to contributions made by participants in both the Ongoing Plan and the Retirees' Plan. In applying the presumptive method, Amalgamated used as the denominator of the fraction, a figure of $17,594,691.00. This amount represented the present value of benefit obligations of both the Retirees' Plan and the Continuing Salaried Plan calculated on a termination basis.

50. Amalgamated used as the numerator of the fraction, under its interpretation of the presumptive method, a figure of $63,119.48. This numerator amount was determined by totalling, for each participant, the contributions he/she had made to the Plan, plus the plan rate of interest, and then reducing that amount by benefit payments which had been made to each such participant prior to the date of Plan termination.

51. The calculation of residual assets "attributable to employee contributions" was made by Coopers & Lybrand as follows:

$$\$5,376,505 \times \frac{\$ \ \ 63,119.48}{\$17,954,691.00} = \$18,817$$

To calculate Retirees' Portion:
$$\text{Retiree Ratio} = \frac{\$ \ \ 24,768.43}{\$17,954,691.00} = .0014$$

To calculate Continuing Plan Portion:
$$\text{Active Ratio} = \frac{\$ \ \ 38,351.05}{\$17,954,691.00} = .0021$$

Reversion to Retirees:
$5,376,505 × .0014 = ............................ $ 7,527

Reversion to Actives:
$5,376,505 × .0021 = ............................ $11,290

Total Reversion ............ $18,817

52. Of the $7,527 attributed by Amalgamated to Retirees, Amalgamated calculated that W.H. Bingham was entitled to receive $4,234.74 and George E. Rush was entitled to receive $3,292.26.

53. Former ERISA § 4044(d)(2), in effect when Amalgamated split the 1976 Plan and terminated the Retirees' Plan, provided that:

Notwithstanding the provisions of paragraph (i), if any assets of the plan attributable to employer contributions, remain after all liabilities of the plan to participants on their beneficiaries have been satisfied, *such assets shall be equitably distributed to employees who made such contributions* ... in accordance with their rate of contributions. (Emphasis added.)

29 U.S.C. § 1344(d)(2) (1985).

54. The PBGC regulation promulgated pursuant to ERISA § 4044(d)(2), and in effect at the date of plan termination, set forth the "presumptive method" and three alternative methods to determine the portion of residual assets attributable to employee contributions. The "presumptive method" states as follows:

b. Unless an alternative method of computation is approved by the PBGC pursuant to paragraphs (c) and (d) of this section, the portion of residual assets attributable to employee contributions shall be computed by multiplying the total residual assets by a fraction—

(1) the numerator of which is the present value of all benefits assigned to priority category 2, pursuant to § 2618.12; and

(2) the denominator of which is the present value of all benefits assigned to priority categories 2 through 6, pursuant to §§ 2618.12 through 2618.16.

29 C.F.R. § 2618.31(b).

55. The PBGC also promulgated regulations directing a sponsor how to "equitably distribute" the portion of residual assets attributable to employee contributions "to the employees who made such contributions ... in accordance with their rate of contributions." This regulation provides as follows:

the share of each member of the pool of eligible participants and beneficiaries in the residual assets ... shall be computed by multiplying the residual assets allocable to the pool of eligible participants and beneficiaries, ... by a fraction—

1) The numerator of which is the present value of the member's benefits assigned to priority category 2 ...; and

(2) The denominator of which is the present value of all benefits assigned to priority category 2 ...

29 C.F.R. § 2618.32(b).

56. Mr. Simmons as trustee, did not exercise any discretionary authority with respect to the aspects of the spinoff termination transaction challenged here. He had no authority in his role as trustee with respect to the decision to terminate, with respect to the determination whether the plan allowed for a reversion, or with respect to the actuarial decisions concerning the amount of reversion.

57. There is no evidence that Amalgamated or any of the fiduciaries made any attempt to consider whether the method of allocating residual assets was equitable to the participants.

## CONCLUSIONS OF LAW

### I. AMALGAMATED'S RIGHT TO A REVERSION

1. The court finds that it has jurisdiction over this matter, and that venue is proper, under ERISA § 4070(c).

2. ERISA section 4044(d)(1) provides that residual or surplus assets may revert to the employer upon termination of a benefit plan if the employer satisfies three conditions:

(A) all liabilities of the plan to participants and their beneficiaries have been satisfied,

(B) the distribution does not contravene any provision of law, and

(C) the plan provides for such a distribution in these circumstances.

ERISA § 4044(d)(1), 29 U.S.C.A. § 1344(d)(1) (1985). Where, as here, employees contributed to the plan, ERISA section 4044(d)(2) sets forth a fourth requirement: that residual assets attributable to employee contributions must be "equitably distributed to the employees ... in accordance with their rate of contributions." ERISA § 4044(d)(2), 29 U.S.C.A. § 1344(d)(2) (1985) (amended in 1987).

3. Amalgamated has satisfied the three conditions of ERISA § 4044(d)(1), as follows:

a. Amalgamated satisfied the liabilities of the Retirees' Plan by purchasing annuities to pay each participant's fully vested nonforfeitable accrued benefit. Amalgamated also satisfied the liabilities of the Ongoing Plan by purchasing annuities to satisfy each participant's fully vested nonforfeitable benefit accrued on the date of plan termination.

b. Subject to the requirements of ERISA concerning equitable distribution, the reversion taken by Amalgamated does not contravene any provisions of law.

c. The applicable Plan provides for a distribution to Amalgamated of a reversion of residual assets upon termination of the Retirees' Plan in the circumstances of this case.

4. The 1953 Plan controlled the rights and obligations of defendants with respect to their entitlement to distribution of the residual assets in this case. Under the terms of the 1953 Plan, defendants were only entitled to a reversion of residual assets due to "erroneous actuarial computation."

5. The amendments to the 1953 Plan which created the 1976 Plan and the Retirees' Plan and which provided for a rever-

sion of any balance, rather than a reversion due to "erroneous actuarial computation," were ineffective because the 1953 Plan specifically required the vote of not less than 75% of all members in the plan in order to effectuate any amendments that would retroactively "prejudice, impair or adversely affect any right of any member acquired by or vested in him." Because no such vote was taken, the provisions of Section 14.4 of the 1953 Plan, under which Amalgamated had disclaimed any right to a reversion of residual assets except for assets due to "erroneous actuarial computation," were fully effective at the time of termination of the Retirees' Plan.

6. A balance which comes about as a result of "erroneous actuarial computation" may consist of the surplus portion of plan assets at plan termination that exist "because actual requirements [of the terminated plan] differ from the expected requirements." 26 C.F.R. § 1.401–2(b)(1).

7. The balance of residual assets in the amount of $5,376,505.00 remaining upon termination of the Retirees' Plan as a matter of law was due solely to "erroneous actuarial computation."

8. Defendants The Amalgamated Sugar Company and The Amalgamated Sugar Company Retirement Plan Committee are fiduciaries pursuant to ERISA § 404(a)(1); 29 U.S.C. § 1104(a)(1) and/or co-fiduciaries pursuant to ERISA § 405(a); 29 U.S.C. § 1105(a), with respect to the manner in which the Retirees' Plan was terminated and residual assets were allocated upon termination.

9. The fiduciary standards set forth in ERISA §§ 404(a)(1) and 405(a); 29 U.S.C. §§ 1104(a)(1) and 1105(a) apply to the allocation of residual assets between Amalgamated and participants in the Retirees' Plan upon termination of that Plan, including methods used to effectuate the allocation.

10. Defendants Amalgamated and the Committee acted solely in the interest of the sponsoring employer, Amalgamated, and themselves, without regard for and without any attempt to determine, the rights and interests of the participants and beneficiaries to whom their fiduciary duties ran.

11. Given the fact that the presumptive method calculations undertaken by defendants resulted in an allocation to Plan participants of .0015% of the residual assets when these same participants had made approximately 25% of the contributions to the Plan, defendants had a fiduciary duty under ERISA to consider alternative methods for calculating an equitable portion of the residual assets attributable to employee contributions and, if necessary, seek approval from the PBGC to utilize this alternative method. Defendants violated both ERISA and section 14.4 of the 1953 Plan by assuming that they were entitled to recoup all residual assets.

12. Even though Amalgamated's pension plan had been non-contributory since the 1980 Amendment, Amalgamated was still required to comply with ERISA § 4044(d)(2). Amalgamated's right to any residual assets which arose due to erroneous actuarial computation is limited by the provisions of ERISA § 4044(d)(2).

13. Amalgamated's right to any residual assets may be determined pursuant to application of regulations promulgated pursuant to § 4044(d)(2), namely, 29 C.F.R. § 2618.30–.32, which sets forth the PBGC's presumptive method, unless that method results in an inequitable distribution.

14. Application of the PBGC's presumptive method and calculations undertaken by the defendants thereunder resulted in an allocation to Plan participants of .0015% of the residual assets when these same participants had made approximately 25% of the contributions to the Plan. This resulted in an inequitable distribution in this case.

15. The presumptive method need not be followed when its application results in an inequitable distribution. This court exercises its equitable powers and adopts a method to calculate the employees' share of the residual assets which results in a more equitable distribution. The method here adopted is similar to the presumptive

method, but is more closely tied to actual contributions made by employees to the Plan. *See* Preamble of the PBGC to final adoption of 29 C.F.R. § 2618 (1990).

16. The numerator of the fraction in the method adopted by the court represents the present value of the Retirees' accumulated employee contributions. The Retirees' accumulated employee contributions is calculated by determining at the date of retirement each employee's mandatory employee contributions under the Plan, along with the earnings on those contributions at the actual earned rate. This figure is compared to the present value of the individual's total retirement benefits at the date of retirement so that for each Retiree it is possible to know what percentage of the individual's total retirement benefits is exclusively due to employee contributions.

The next step is to recalculate the present value of retirement benefits at the date of Plan termination. (The present value of retirement benefits at the date of Plan termination is decreased to the extent of pension benefits paid out under the Plan.) This new figure for the present value of total benefits is then multiplied by the same percentage arrived at above, resulting in proportionately reduced present value of accumulated employee benefits for each Retiree. Adding together each Retiree's accumulated employee contributions at the date of Plan termination provides the figure used in the numerator. That figure is $1,454,838.92.

17. The denominator of the fraction adopted by the court is the present value of total benefits provided under the Retirees' Plan. The best evidence of this is the actual purchase price of the annuity purchased from Pacific Mutual Insurance Company by defendants to pay the costs of these benefits. Accordingly, the figure used in the denominator is $8,472,200.00.

18. Application of the court's method to determine residual assets attributable to employee contributions results in the following calculation:

To calculate Retirees' percentage contribution to the Plan:

$$\frac{\$1,454,839.00}{\$8,472,200.00} = 17.17\%$$

To calculate Retirees' portion of the residual assets:

$$17.17\% \times \$5,376,505.00 = \$923,146.00$$

19. Since a total of $915,679.00 ($923,146.00 less $7,527.00) was improperly distributed to Amalgamated as of July 1, 1986, in breach of defendants' fiduciary duty and in violation of the requirements of the Plan documents, ERISA and the IRS Code, judgment for that amount shall be entered against defendants Amalgamated and Amalgamated Sugar Company Retirement Plan Committee, plus interest from July 1, 1986, to the date of Judgment. The Judgment will continue to accrue interest at the federal legal rate until satisfied.

20. Defendant Simmons is not liable under ERISA § 404(a)(1)(A), ERISA § 404(a)(1)(D), or ERISA § 406. Plaintiffs have not shown that Mr. Simmons had actual knowledge that Amalgamated breached its fiduciary duty by performing a spinoff termination of the 1976 Plan. Also, the acts complained of here fall outside the scope of Mr. Simmons' fiduciary function with respect to the Plan.

21. Plaintiffs are entitled to recover costs of the suit and reasonable attorneys' fees.

Counsel for plaintiff are directed to prepare and lodge with the court within thirty (30) days a form of Judgment consistent with these Findings and Conclusions. The form of Judgment should be approved as to form by counsel for defendants. Counsel for plaintiff are also directed to submit to the court, with a copy to defendants, a schedule of attorney's fees which details fees incurred on an hourly basis, categorized by subject matter, who performed the services, rates and what was done. An alternative computation based upon contingent fee rates should also be submitted. This is with the understanding that the court must approve and may adjust fees

without regard to contingent fee arrangement or hourly rate computation.