105 F.3d 1288
 65 USLW 2498, 20 Employee Benefits Cas. 2393,
97 Cal. Daily Op. Serv. 669,
97 Daily Journal D.A.R. 845,
Pens. Plan Guide (CCH) P 23930V
 Stanley I. JACOBSON; Daniel P. Welsh; Robert E. McMillin;
Ernest O. Blandin; Richard E. Hook, Plaintiffs-Appellants,
v.
HUGHES AIRCRAFT COMPANY; Hughes Non-Bargaining Retirement
Plan, Defendants-Appellees.
 No. 93-55392.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 4, 1993.
Decided Jan. 23, 1997.
 
 Jerome Tauber, Sipset, Weinstock, Harper & Dorn, New York City, for plaintiffs-appellants.
 Robert F. Walker (argued/brief), and Belinda K. Orem (brief), Paul, Hastings, Janofsky, Walker, Santa Monica, CA, for defendants-appellees.
 Appeal from the United States District Court for the Central District of California, Richard A. Gadbois, Jr., District Judge, Presiding. D.C. No. CV-92-04020-RG.
 Before FLETCHER, PREGERSON and NORRIS, Circuit Judges.
 Opinion by Judge PREGERSON; Dissent by Judge NORRIS.
 PREGERSON, Circuit Judge:
 
 
 1
 Plaintiffs appeal the district court's dismissal of their action brought under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et. seq. Plaintiffs are retired Hughes Aircraft Company employees who are participants in the Hughes Non-Bargaining Retirement Plan (the "Contributory Plan"). Plaintiffs allege in their complaint that the employer, defendant Hughes Aircraft Company ("Hughes"), breached its statutory and fiduciary duties under ERISA when it used the Contributory Plan's surplus assets-attributable in part to employee contributions-to fund an early retirement program for existing employees and a new non-contributory pension plan for some employees that were not participants of the Contributory Plan. Plaintiffs seek a variety of remedies, including a distribution of "all or a portion of the excess Plan assets" in the form of increased benefits. The district court dismissed plaintiffs' complaint under Fed.R.Civ.P. 12(b)(6), without leave to amend. The simple question before us is whether plaintiffs have alleged sufficient facts in their complaint to state any claim for relief under ERISA. Assuming plaintiffs can prove what they have plead in their complaint, we conclude their claims are cognizable. We, therefore, reverse.
 
 FACTS
 
 2
 According to the complaint,[1] defendant Hughes is an aerospace and electronics manufacturing company. Since 1951, Hughes has provided a retirement pension plan for its employees. At issue in this litigation is the use by Hughes of surplus assets from the Contributory Plan.
 
 
 3
 The terms of the Contributory Plan provide, in relevant part, that both Hughes and its employees must contribute to the Plan. The employees' contributions are automatically deducted from their pay. By 1986, as a result of both employer and employee contributions and as a result of investment growth, the Contributory Plan's assets exceeded the actuarial or present value of accrued benefits by almost one billion dollars.
 
 
 4
 Apparently, because of this surplus, and after being acquired by the General Motors Corporation, Hughes, in 1987, ceased making contributions to the Contributory Plan.[2] The employees, in contrast, despite the overfunding, were required to continue making contributions to the Contributory Plan. As of January 1, 1992, approximately half the surplus in the Contributory Plan was attributable to employee contributions and the other half to employer contributions.
 
 
 5
 In 1989, Hughes amended the Plan and used part of the asset surplus to provide an early retirement program for existing employees. According to plaintiffs, by offering this program, Hughes was able to reduce its workforce and save payroll costs.
 
 
 6
 Plaintiffs also allege in their complaint that Hughes terminated the Contributory Plan on January 1, 1991, when Hughes created a new defined benefit plan (the "Non-Contributory Plan") and froze new enrollment in the Contributory Plan. The new Non-Contributory Plan covers all new employees as well as those old employees who chose not to remain in the Contributory Plan.
 
 
 7
 Although created through an "amendment" to the Contributory Plan, the Non-Contributory Plan shares virtually no characteristics with the older plan, other than administration by the same trustees. The Contributory Plan is elective and requires monthly contributions by the employees. The Contributory Plan also provides health coverage, a cost of living adjustment, and unreduced early retirement benefits.
 
 
 8
 In contrast, the Non-Contributory Plan requires no employee contributions, and new employees are enrolled automatically. The new plan does not provide health coverage, cost of living adjustment, or unreduced early retirement benefits. In addition, the new plan pays lower monthly retirement benefits than the Contributory Plan, and the two plans use different formulas to compute benefits.
 
 
 9
 According to plaintiffs' complaint, Hughes used and continues to use the asset surplus generated by employee and employer contributions from the Contributory Plan to fund the new Non-Contributory Plan. Plaintiffs further allege that in so doing, Hughes is improperly using plan assets attributable in part to employee contributions for its own benefit.
 
 
 10
 Plaintiffs filed this class action in the United States District Court for the District of Arizona. The putative class consists of over 10,000 persons who were participants in the Contributory Plan on December 31, 1991. The court granted Hughes's motion to transfer venue to the Central District of California. Defendants filed a motion to dismiss under Federal Rules of Civil Procedure 12(b)(6). The district court granted the motion and dismissed plaintiffs' complaint without leave to amend. No discovery was ever taken in the district court.
 
 ANALYSIS
 A. Standard of Review
 
 11
 We review de novo a district court's dismissal of a complaint for failure to state a claim under Federal Rules of Civil Procedure 12(b)(6). Everest and Jennings v. American Motorists Ins. Co., 23 F.3d 226, 228 (9th Cir.1994) (citations omitted). We apply the same standard on appeal as the district court. Id. "It is axiomatic that a complaint should not be dismissed unless 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' Conley v. Gibson, 355 U.S. 41, 45-46 [78 S.Ct. 99, 102, 2 L.Ed.2d 80] (1957); see 5 C. Wright & A. Miller, Federal Practice & Procedure §§ 1202, 1205-1207, 1215-1224, 1228 (1969)." McLain v. Real Estate Bd. of New Orleans, 444 U.S. 232, 246, 100 S.Ct. 502, 511, 62 L.Ed.2d 441 (1980) (emphasis added).
 
 
 12
 The Supreme Court has consistently adhered to this standard. Most recently, in Hartford Fire Ins. Co. v. California, 509 U.S. 764, 809-13, 113 S.Ct. 2891, 2916-17, 125 L.Ed.2d 612 (1993), Justice Scalia, who concurred in the Court's decision, stated that, although he disagreed with Justice Souter's analysis as to what constitutes a boycott, he agreed that the action should not be dismissed because "other allegations in the complaints describe conduct that may amount to a boycott if the plaintiffs can prove certain additional facts." Id. (emphasis added). Justice Scalia further noted that allegations in a complaint are to be "[l]iberally construed" at the 12(b)(6) stage. Id. at 811, 113 S.Ct. at 2917.
 
 
 13
 Thus, a court's role at the 12(b)(6) stage is not to decide winners and losers or evaluate the strength or weakness of claims. See Everest and Jennings, 23 F.3d at 228; Abramson v. Brownstein, 897 F.2d 389, 391 (9th Cir.1990). Nor can a court resolve factual questions at the 12(b)(6) stage. We must accept as true the allegations in the complaint and decide only whether plaintiff has advanced potentially viable claims.
 
 
 14
 With this standard in mind, we now examine plaintiffs' claims in this action.
 
 B. Plaintiffs' ERISA Claims
 
 15
 At the heart of this dispute is whether Hughes is entitled to use and control for its own benefit the Contributory Plan's one billion dollar surplus, approximately half of which was generated by employee contributions. This is not a case in which the pension plan at issue was funded entirely by employer contributions. Nor is this a case in which the employer used the plan's asset surplus solely to benefit participants of the plan. Because plaintiffs allege that the employer used the Contributory Plan's asset surplus attributable in part to employee contributions for its own benefit and for the benefit of employees who were never participants in the Contributory Plan, we conclude that plaintiffs have stated cognizable claims under ERISA.
 
 First Claim
 
 16
 Plaintiffs' first claim alleges that Hughes violated ERISA § 403(c)(1), 29 U.S.C. § 1103(c)(1), which provides that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants of the plan." The term "inure" has been defined as "mean[ing] broadly to 'become of advantage to the employer.' " Amato v. Western Union Int'l, Inc., 773 F.2d 1402, 1414 (2d Cir.1985)(citing Teamsters Local 639 v. Cassidy Trucking, Inc., 646 F.2d 865, 868 (4th Cir.1981)), cert. dismissed, 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986).
 
 
 17
 The district court rejected plaintiffs' anti-inurement claim. We agree with the district court that Hughes did not violate § 1103(c)(1) by the mere fact that Hughes ceased its contributions to the Contributory Plan. The terms of the Contributory Plan require Hughes to contribute to the Plan only when necessary to ensure sufficient funding. ERISA does not require an employer to contribute to an overfunded plan. See Fechter v. HMW Indus., Inc., 879 F.2d 1111, 1113 (3rd Cir.1989).
 
 
 18
 This, however, does not mean that Hughes can use the Contributory Plan's asset surplus for its own benefit and for the benefit of employees who were never participants in the Contributory Plan. Hughes did not do anything so blatant as to distribute the surplus to itself and to the new employees. Instead, Hughes twice "amended" the Contributory Plan to its own advantage and used the asset surplus attributable in part to plaintiffs' contributions to offer an early retirement program and the Non-Contributory Plan for existing and new employees. By so doing, plaintiffs allege, Hughes reduced its labor costs while effectively increasing new employees' wages. Thus we find that, based on plaintiffs' allegations, Hughes has taken advantage of the plan's asset surplus for its own benefit.
 
 
 19
 Hughes, however, contends that its "amendments" creating two new benefits structures under the Contributory Plan did not violate ERISA's anti-inurement provision, because Hughes was not acting as a fiduciary when it "amended" the plan. To support its contention, Hughes relies on the Supreme Court's recent decision in Lockheed Corp. v. Spink, --- U.S. ----, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996).
 
 
 20
 In Lockheed, the Supreme Court held that amending an existing pension plan to use surplus assets to fund an early retirement program for participants of the plan does not violate ERISA, so long as other ERISA provisions are not violated. Id. at ----, 116 S.Ct. at 1790 ("While other portions of ERISA govern plan amendments, see, e.g., 29 U.S.C. § 1054(g) (amendment generally may not decrease accrued benefits); § 1085b (if adoption of an amendment results in underfunding of a defined benefit plan, the sponsor must post security for the amount of the deficiency), the act of amending a pension plan does not trigger ERISA's fiduciary provisions."). As the Supreme Court explained, generally "[p]lan sponsors who alter the terms of a plan do not fall into the category of fiduciaries" under ERISA. Id. at ----, 116 S.Ct. at 1789.
 
 
 21
 Lockheed, however, can be distinguished from this case. First, the Supreme Court in Lockheed did not address whether the early retirement program in that case violated ERISA's anti-inurement provision. Here, plaintiffs allege that Hughes improperly benefited from using plan assets. Second, the asset surplus that was used in Lockheed to fund the early retirement program was attributable only to employer contributions. Here, plaintiffs allege that the asset surplus Hughes used to fund the early retirement program and the new Non-Contributory Plan was attributable to both employer and employee contributions. Third, the early retirement program in Lockheed only benefited employees who were already participants in the existing pension plan. Here, some of the employees benefiting from the Non-Contributory Plan are new employees who were never participants in the Contributory Plan. Fourth, plaintiffs in Lockheed did not allege that the employer had terminated the pension plan. Here, plaintiffs allege that Hughes terminated the Contributory Plan when it froze new enrollment and created the Non-Contributory Plan. Lastly, the plaintiffs in Lockheed did not allege that the amendment resulted in the violation of any other ERISA provisions. Here, plaintiffs allege that by using the asset surplus attributable in part to employee contributions Hughes reduced plaintiffs' accrued benefits and violated ERISA's vesting, nonforfeiture, and distribution requirements under 29 U.S.C. §§ 1053(a) and 1344.
 
 
 22
 Thus, Lockheed is of little help in determining whether Hughes's use of the Contributory Plan's asset surplus attributable in part to employee contributions violates ERISA. Even if we were to hold that under Lockheed Hughes's "amendments" in this case did not trigger its fiduciary obligations under ERISA, that does not mean that we must also hold that Hughes's conduct did not trigger ERISA's anti-inurement provision.
 
 
 23
 We have found no case which holds that the anti-inurement provision is only triggered when an employer is acting as a fiduciary. Nor can we reasonably interpret 29 U.S.C. § 1103(c)(1) as establishing such a requirement. Unlike other provisions under ERISA, see, e.g., 29 U.S.C. § 1104 (specifically addressing fiduciary duties) and 29 U.S.C. § 1106 (specifically referring to a fiduciary), § 1103 makes no reference to fiduciaries or fiduciary obligations. Section 1103 refers only to employers, stating that "assets of a plan shall never inure to the benefit of any employer." 29 U.S.C. § 1103(c)(1). Thus, we hold that under a plan reading of § 1103, Hughes's alleged conduct in this case triggers ERISA's anti-inurement provision, whether or not the alleged conduct implicates ERISA's fiduciary obligations.
 
 
 24
 The dissent, however, asserts that the fact that an asset surplus is attributable in part to employee contributions is irrelevant. According to the dissent, an employer has sole discretion as settlor to use an asset surplus attributable in part to employee contributions. We disagree.
 
 
 25
 Under ERISA, Congress specifically provided protections for assets attributable to employee contributions. Congress enacted 29 U.S.C. § 1053, which establishes minimum vesting and nonforfeiture requirements for accrued benefits derived from employee contributions. In addition, section 4404 requires that, upon a plan's termination, any residual assets attributable to employee contributions "shall be equitably distributed to the participants who made such contributions," after all liabilities have been satisfied. 29 U.S.C. § 1344(d)(3)(A).
 
 
 26
 It is clear from these provisions that Congress intended to distinguish between plan assets attributable solely to employer contributions from plan assets attributable in part to employee contributions. As the Fifth Circuit has explained:
 
 
 27
 An entirely employer funded defined benefit plan pension trust is therefore more akin to a gratuitous trust so far as concerns surplus assets, as to which ERISA so markedly distinguishes between those attributable to employer contributions (thus suggesting that employer contributions are not a form of recontributed wages for such purposes). Where a gratuitous trust is fully performed without exhausting the trust estate, a resulting trust of the surplus is presumed to arise in favor of the settlor. RESTATEMENT (SECOND) OF TRUST § 430. This principle has been looked to in holding an employer entitled to surplus assets on termination of an employer funded defined benefit pension plan.
 
 
 28
 Borst v. Chevron Corp., 36 F.3d 1308, 1315 (5th Cir.1994) (emphasis added).
 
 
 29
 Thus, to ignore the distinction between a plan funded solely by employer contributions and a plan funded by both employer and employee contributions would eviscerate the protections provided to employees under ERISA with respect to their employee contributions. We, therefore, hold that, when both the employer and its employees contribute to a pension plan, the employer does not have sole discretion to use that part of a plan's asset surplus attributable to employee contributions.
 
 
 30
 Hughes, alternatively, argues, that even if plaintiffs are entitled to some portion of the asset surplus, the anti-inurement provision has not been triggered in this case because Hughes has not withdrawn or threatened to withdraw plan assets. Hughes relies on a Second Circuit decision, Amato v. Western Union Int'l, Inc., 773 F.2d 1402, in support of its position.
 
 
 31
 Amato does not help Hughes. Like Lockheed, Amato involves an amendment to a non-contributory pension plan that reduced retirement benefits for a group of participants under an existing plan. As discussed above, this distinction is critical. While an employer may have the discretion to decide how to use an asset surplus attributable solely to employer contributions, so long as other provisions of ERISA are not violated, an employer does not have sole discretion to use a plan's asset surplus attributable in part to employee contributions to benefit itself and employees that were never participants in the plan. By its plain language, the anti-inurement provision requires that plan assets must "never inure to the benefit of any employer" and must be used "for the exclusive purposes of providing benefits to participants of the plan." 29 U.S.C. § 1103(c)(1) (emphasis added).
 
 
 32
 Further, to affirm the district court's dismissal on the ground that under Amato plan assets were never withdrawn in this case would require us to resolve disputed issues of fact. We would have to conclude that no termination has occurred and that only one plan exists. We, however, cannot resolve factual issues on a motion to dismiss.
 
 
 33
 In ruling on a 12(b)(6) motion, plaintiffs' allegations must be taken as true. Here, plaintiffs allege that by "amending" the Contributory Plan to freeze its enrollment and to create a separate Non-Contributory Plan for new employees, Hughes, in effect, terminated the Contributory Plan and "withdrew" the surplus assets for its own use and for the benefit of some employees who were never participants in the Contributory Plan.[3] If in fact plaintiffs can prove that two separate plans exist and that Hughes's amendment terminated the Contributory Plan, Hughes's withdrawal of assets from the Contributory Plan to create and fund the new Non-Contributory Plan for the benefit of some employees who were never participants in the Contributory Plan violated ERISA's anti-inurement provision.[4]
 
 
 34
 Hughes, however, contends that any benefit it receives from using the surplus assets of the Contributory Plan is an "incidental side effect," insufficient as a matter of law to state a claim under the anti-inurement provision. Holliday v. Xerox Corp., 732 F.2d 548, 551 (6th Cir.1984), cert. denied, 469 U.S. 917, 105 S.Ct. 294, 83 L.Ed.2d 229 (1984). We reject this contention.
 
 
 35
 Whether Hughes gains an "incidental" economic benefit from being able to buy out its older employees through an early retirement program and by being able to offer new employees a pension plan that requires no employee contributions is a question of fact we cannot resolve on a 12(b)(6) motion. To resolve this factual question, we would have to look beyond the allegations in the complaint. This, we cannot do. We reiterate that on a 12(b)(6) motion we must take as true each allegation in plaintiffs' complaint and draw all reasonable inferences in favor of plaintiffs.
 
 
 36
 Based on the liberal 12(b)(6) standard, we believe that plaintiffs' allegations are sufficient to state a claim under ERISA's anti-inurement provision. Hughes, in effect, remained competitive in the labor market by using the asset surplus, created in part by employee contributions, to reduce its labor costs and to increase new employees' wages. Had Hughes not used the Contributory Plan's surplus, Hughes would have had to use its own revenues or offered fewer benefits to its new employees. We cannot say at the 12(b)(6) stage that Hughes's alleged benefit is an "incidental side effect" that does not violate ERISA's anti-inurement provision.
 
 Second Claim
 
 37
 Plaintiffs' second claim alleges that Hughes breached its fiduciary duties under ERISA § 404, 29 U.S.C. § 1104, by using the Contributory Plan's surplus assets to fund the Non-Contributory Plan for some employees that never were participants in the Contributory Plan. Section 1104 requires that a fiduciary "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(A)(1) (emphasis added). The complaint, by alleging that Hughes is using funds attributable to their employee contributions to fund a new plan for some employees who were never participants in the Contributory Plan, states a valid claim for relief.
 
 
 38
 Hughes, however, contends that its conduct did not violate ERISA's § 1104. Hughes maintains that it was not acting as a fiduciary when it "amended" the Contributory Plan to use the asset surplus. According to Hughes, an employer, as settlor, can change a plan's structure at any time, for whatever reason, and for anyone's benefit without implicating its fiduciary duties under ERISA.
 
 
 39
 The district court agreed. The district court concluded that Hughes's decision to amend the Contributory Plan to provide for asset surplus reversion to itself was a plan design decision that did not implicate ERISA's fiduciary obligations, regardless of the fact that the asset surplus was attributable in part to employee contributions and used to benefit some employees who were never participants in the Contributory Plan. The district court was wrong.
 
 
 40
 As discussed above, based on our reading of the relevant ERISA provisions, we hold that, when an employer is not the sole contributor of a pension plan, the employer does not have sole discretion to use the asset surplus of the plan. If employees contribute to the plan, the employer has a fiduciary duty to the employees when it amends the plan to use an asset surplus. In essence, when a plan is funded by both employer and employee contributions, both the employer and the employees are co-settlors of the plan.
 
 
 41
 The recent Supreme Court decisions construing ERISA's fiduciary provisions do not dictate otherwise. See Lockheed Corp. v. Spink, --- U.S. ----, 116 S.Ct. 1783; Varity Corp. v. Howe, --- U.S. ----, 116 S.Ct. 1065. It is true that in Lockheed, the Supreme Court held that an amendment to a plan to provide an early retirement program for existing employees did not trigger ERISA's fiduciary obligations because "[w]hen employers undertake those actions, ... they do not act as fiduciaries, ... but are analogous to the settlors of a trust." --- U.S. at ----, 116 S.Ct. at 1789. But as discussed above, the employer in Lockheed was the sole contributor of the plan and used the plan's surplus only to benefit the plan's participants. Here, plaintiffs allege that Hughes used the Contributory Plan's surplus assets attributable in part to employee contributions for Hughes's own benefit and for the benefit of some employees who were never participants in the Plan.
 
 
 42
 Thus, we cannot say that Hughes was simply acting like a settlor of a trust when it "amended" the plan to fund the Non-Contributory Plan for existing and new employees. We hold that, when an employer amends a plan to use for its own benefit an asset surplus attributable in part to employee contributions, the employer is wearing both its "fiduciary" and its "employer" hats. See Varity, --- U.S. at ----, 116 S.Ct. at 1073 ("reasonable employees, in the circumstances found by the District Court, could have thought that Varity was communicating with them both in its capacity as employer and in its capacity as plan administrator").
 
 
 43
 In Varity, the Supreme Court construed 29 U.S.C. § 1002(21)(A), which provides that a person acts as "a fiduciary with respect to a plan to the extent ... he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets ... or he has any discretionary authority or discretionary responsibility in the administration of such plan." The Supreme Court held that this definition "limit[s] the scope of fiduciary activity to discretionary acts of plan 'management' and 'administration.' " --- U.S. at ---- - ----, 116 S.Ct. at 1072-1073.
 
 
 44
 The Supreme Court also looked to trust law to construe the meaning of "fiduciary" and trust "administration." As the Supreme Court observed:
 
 
 45
 The ordinary trust law understanding of fiduciary "administration" of a trust is that to act as an administrator is to perform the duties imposed, or exercise the powers conferred, by the trust documents.... The law of trusts also understands a trust document to implicitly confer "such powers as are necessary or appropriate for the carrying out of the purposes" of the trust.
 
 
 46
 Id. at ----, 116 S.Ct. at 1073. Further, the Supreme Court stated:
 
 
 47
 There is more to plan (or trust) administration than simply complying with the specific duties imposed by the plan documents or statutory regime; it also includes the activities that are "ordinary and natural means" of achieving the "objective" of the plan.... Indeed, the primary function of the fiduciary duty is to constrain the exercise of discretionary powers which are controlled by no other specific duty imposed by the trust instrument or the legal regime. If the fiduciary duty applied to nothing more than activities already controlled by other specific legal duties, it would serve no purpose.
 
 
 48
 Id. at ---- - ----, 116 S.Ct. at 1073-1074.
 
 
 49
 Under Varity, therefore, the question we must answer is whether Hughes was carrying out discretionary functions relating to plan management and administration when it "amended" the plan to use surplus assets attributable in part to employee contributions.
 
 
 50
 We answer this question affirmatively, and conclude that, based on the allegations in plaintiffs' complaint, Hughes was acting as a fiduciary when it "amended" the plan. There is no question that Hughes's amendment triggered ERISA's statutory duties with respect to assets attributable to employee contributions. In addition, because Hughes was disposing of the plan's assets when it amended the plan, Hughes's amendment necessarily affected the management and administration of the plan. Further, the use of surplus assets from one plan to fund another plan that benefits new employees who were never participants in the first plan may increase the risk of underfunding and non-payment.
 
 
 51
 Hughes, however, contends that there can be no violation of the exclusive benefit rule under 29 U.S.C. § 1104 because only one plan and one group of employees exist in this case. To adopt Hughes's contention at the pleading stage, we would have to disregard plaintiffs' allegations in the complaint that two separate pension plans exist and that the new employees benefiting from the Contributory Plan's asset surplus never were participants in the Contributory Plan. Because we must take as true all of the allegations plaintiffs make in their complaint, we find that plaintiffs' allegations are sufficient to overcome a dismissal under 12(b)(6).
 
 
 52
 A Seventh Circuit case, Johnson v. Georgia-Pacific Corp., 19 F.3d 1184 (7th Cir.1994), does not persuade us otherwise. In Johnson, the employer, GNN, amended the company pension plan to provide increased benefits to active workers and thereby deter a hostile takeover. After GNN was acquired, the surplus from the pension plan was distributed in the form of increased wages to the active employees. The retired workers brought suit, alleging that GNN breached its fiduciary duties under ERISA by not also increasing their benefits. The Seventh Circuit found that the district court properly dismissed the retirees' claims.
 
 
 53
 The instant case presents a fundamentally different scenario. Like the employer in Lockheed, the employer in Johnson chose to give an extra benefit to one group of employees within a larger group, all of whom were participants in the same plan. Id. at 1186-1187. There was no allegation in Johnson that the employer transferred assets from one plan to another or that the asset surplus was used to benefit employees who were not participants of the plan. Id. at 1189. The Seventh Circuit found that, even though it favored one group of employees over others, GNN was still exercising its duties in the sole interest of the plan participants. Id. at 1187.
 
 
 54
 Here, we cannot say that when Hughes "amended" the plan to use the asset surplus it was "managing" or "disposing of" plan assets for the sole benefit of participants in one plan. Id. at 1189. Plaintiffs allege in their complaint that the Contributory Plan was terminated and that the new Non-Contributory Plan benefited some employees who were never participants in the Contributory Plan. Based on these allegations, we find that when Hughes used the Contributory Plan surplus to create and fund the Non-Contributory Plan, Hughes was managing and disposing of plan assets within the meaning of ERISA. Assuming that plaintiffs can prove their allegations, we conclude that Hughes's conduct implicated its fiduciary duties under ERISA. Plaintiffs, therefore, have stated a claim for relief under § 1104 of ERISA.
 
 Third Claim
 
 55
 Plaintiffs' third claim alleges that Hughes violated ERISA § 203, 29 U.S.C. § 1053(a), by using vested, nonforfeitable benefits to meet Hughes's obligations to fund the Contributory and Non-Contributory Plans. Plaintiffs allege that, by depleting the surplus to fund the Non-Contributory Plan, Hughes, in effect, forfeited plaintiffs' accrued benefits derived from employee contributions. Plaintiffs contend that under ERISA employees are entitled to accrued benefits traceable to their own contributions, even if the amount of such benefits exceeds the defined benefits under the plan. We agree that, if employees' own contributions and the income their contributions generate exceed the defined benefit amount under the plan, ERISA requires that employees be paid the larger amount.
 
 
 56
 Section 1053 establishes minimum vesting and nonforfeiture requirements for all pension plans, providing, in relevant part:
 
 
 57
 Each pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age and in addition shall satisfy the requirements of paragraphs (1) and (2) of this subsection.
 
 
 58
 (1) A plan satisfies the requirements of this paragraph if an employee's rights in his accrued benefit derived from his own contributions are nonforfeitable.
 
 
 59
 ....
 
 
 60
 29 U.S.C. § 1053(a)(1). Paragraph (2) establishes the vesting requirements for an employee's accrued benefit derived from employer contributions. The vesting requirements for employer contributions are not at issue in this case.
 
 
 61
 To determine the amount of accrued benefits under paragraph (1), we look to § 1054(c)(2)(B), which defines the "accrued benefit derived from contributions made by an employee" as the employee's "accumulated contributions expressed as an annual benefit commencing at normal retirement age." Section 1054(c)(2)(C), in turn, defines "accumulated contributions" to include the employee's mandatory contributions plus appropriate interest. Further, 29 U.S.C. § 1002(23) provides that "[t]he accrued benefit of an employee shall not be less than the amount determined under section 1054(c)(2)(B) of this title with respect to the employee's accumulated contribution." (Emphasis added.)
 
 
 62
 A plain reading of these ERISA provisions makes clear that plaintiffs are entitled to more than the amount of defined benefits under the plan if that amount is less than the accrued benefits derived from their mandatory employee contributions. In other words, § 1053 establishes a floor with respect to mandatory employee contributions: the amount of accrued benefits cannot fall below the amount of accrued benefits derived from employee contributions. If it does, the employer violates the minimum vesting and forfeiture requirements of 29 U.S.C. § 1053.
 
 
 63
 As the Supreme Court has stated, "the concepts of vested rights and nonforfeitable rights are critical to the ERISA scheme." Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 510, 101 S.Ct. 1895, 1899-1900, 68 L.Ed.2d 402 (1981). "One of the primary purposes of the Act is to insure that plan participants do not lose vested benefits because of 'unduly restrictive' forfeiture[s]." Hummell v. S.E. Rykoff & Co., 634 F.2d 446, 449 (9th Cir.1980).
 
 
 64
 Thus, by establishing minimum vesting and pay-out requirements for all pension plans under section 1053, Congress gave employees nonforfeitable rights to their vested benefits. A "nonforfeitable" right is defined under ERISA as " 'a claim obtained by a participant or his beneficiary to that part of an immediate or deferred benefit under a pension plan which arises from the participant's service, which is unconditional, and which is legally enforceable against the plan.' " 29 U.S.C. § 1002(19) (emphasis added). In construing this definition, the Supreme Court has stated that "[i]t is therefore surely consistent with the statutory definition of 'nonforfeitable' to view it as describing the quality of the participant's right to a pension rather than a limit on the amount he may collect." Alessi, 451 U.S. at 512, 101 S.Ct. at 1900 (quotations and citations omitted) (emphasis added).
 
 
 65
 Hughes maintains that the forfeiture requirements apply only upon termination, which, according to Hughes, has not occurred here. Hughes, however, cites no cases to support its assertion that the forfeiture requirements are triggered only upon termination. Nor is such an interpretation supported by the language of 29 U.S.C. § 1053. This section does not mention termination, nor does it reference 29 U.S.C. § 1344(d)(2), which requires the equitable distribution of residual plan assets attributable to employee contributions upon the termination of a plan.
 
 
 66
 Hughes further argues that in a defined benefit plan accrued benefits attributable to employee contributions can be forfeited where a surplus exists. In support of its position, Hughes quotes a passage from Hummell, which states that "nothing in ERISA prohibits 'a plan's providing for forfeiture of benefits when the affected benefits are in excess of the minimum vesting requirements of 29 U.S.C. § 1053.' " 634 F.2d at 450.
 
 
 67
 This passage does not help Hughes. In Hummell, the accrued benefits at issue were attributable only to employer contributions. We held that the forfeiture in Hummell did not violate ERISA's minimum vesting requirements because the accrued benefits all from employer contributions exceeded the minimum vesting requirements under 29 U.S.C. § 1053(a).[5] Therefore, Hummell 's holding, which allows an employer to forfeit benefits in excess of the minimum vesting requirements when all the benefits derive from employer contributions, cannot be extended to situations where, as here, a portion of the surplus assets are attributable to employee contributions. By statutory definition, employees are vested in their own contributions and the income generated therefrom.
 
 
 68
 As discussed above, plaintiffs in this case allege that Hughes is using accrued benefits that are protected by ERISA's minimum vesting and nonforfeiture requirements. Because such benefits are attributable to employee contributions and thus nonforfeitable under 29 U.S.C. § 1053(a), Hughes's alleged forfeiture may violate ERISA.[6] Even if we were to concede for purposes of argument that section 1053 is triggered only upon termination,[7] we must still reverse the district court because the complaint alleges that a termination has occurred. Plaintiffs, therefore, have stated a claim for relief under 29 U.S.C. § 1053.[8]
 
 Fourth Claim
 
 69
 Plaintiffs' fourth claim alleges that Hughes violated ERISA § 4404, 29 U.S.C. § 1344, which addresses the allocation of assets when an employer terminates a plan. Section 1344(d)(3)(A) requires that any residual assets attributable to employee contributions that remain after all liabilities have been satisfied "shall be equitably distributed to the participants who made such contributions." Id. Further, § 4404(d)(1) provides that an employer may cause reversion of excess assets to itself only if "(A) all liabilities of the plan to the participants and their beneficiaries have been satisfied, (B) the distribution does not contravene any provision of law and (C) the plan provides for such a distribution." Id.
 
 
 70
 The complaint alleges that Hughes terminated the Contributory Plan when it froze enrollment in the Contributory Plan and created the Non-Contributory Plan for new employees without equitably distributing the surplus attributable to the employee contributions. The complaint further alleges that the Contributory Plan does not contain a provision for reversion of excess assets upon termination. Based on these allegations, we find that plaintiffs stated a claim under § 1344.
 
 
 71
 In determining whether a plan has been terminated, courts must look to "all the facts and circumstances in a particular case." 26 C.F.R. § 1.401-6(b)(1). See also Borst, 36 F.3d at 1313 n. 9. Under the applicable regulations, the Department of the Treasury has construed termination to "include[ ] both a partial termination and a complete termination of a plan." Id. at § 1.401-6(b)(2). Examples of when a termination may occur include: (1) an employer beginning to discharge employees in connection with winding down a business; (2) an employer replacing a plan with a non-comparable plan; (3) an employer amending the plan to exclude a group of employees who were formerly covered by the plan; (4) an employer changing the eligibility and vesting requirements under the plan; or (5) an employer reducing or eliminating its contributions to the plan. Id. at § 1.401-6(b). See also In re Gulf, 764 F.Supp. at 1202 (finding constructive termination by applying wasting trust principles to ERISA context).
 
 
 72
 Assuming that plaintiffs can prove that Hughes terminated the Contributory Plan, ERISA would require Hughes to equitably distribute to employees the surplus assets attributable to employee contributions. See, e.g., Bridgestone/Firestone v. Pension Benefit Guaranty Corp., 892 F.2d 105 (D.C.Cir.1989) (holding that employer required to return surplus attributable to employee contributions under § 1344 upon termination of defined benefit plan). Thus, we conclude that plaintiffs have stated a claim under § 1344.
 
 Fifth Claim
 
 73
 Plaintiffs' fifth claim alleges that the defendants breached their fiduciary duties under 29 U.S.C. § 1106(a)(1)(D), which prohibits the "transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan." The complaint alleges that the Contributory Plan and the Non-Contributory Plan are two different plans, and that transferring funds from one to the other is prohibited by ERISA.
 
 
 74
 The district court dismissed the fifth claim by finding that only one plan exists in this case. As discussed above, the district court erred in making this finding because it contradicts plaintiffs' allegations in the complaint. As we stated above, courts are not supposed to resolve questions of fact on a 12(b)(6) motion. Even assuming that only one plan exists, we still find that plaintiffs' allegations are sufficient to state a claim under § 1106(a)(1)(D). See Cutaiar v. Marshall, 590 F.2d 523, 529 (3rd Cir.1979) ("[w]hen identical trustees of two employee benefit plans whose participants and beneficiaries are not identical effect a loan between the plans without a[n] ... exemption, a per se violation of ERISA exists").
 
 
 75
 As we discussed above, Hughes was acting as a fiduciary when it "amended" the Contributory Plan to use surplus assets attributable to plaintiffs' employee contributions. As a fiduciary, Hughes was prohibited under § 1106(a)(1)(D) from using the asset surplus attributable to employee contributions for its own benefit and for the benefit of new employees who were never participants in the plan.
 
 
 76
 Although the Supreme Court held in Lockheed, that "payment of benefits to plan participants and beneficiaries pursuant to terms of an otherwise lawful plan is wholly outside the scope of" § 1106(a)(1)(D), the Supreme Court also recognized that "commercial bargains that present special risk of plan underfunding" or that "involve uses of plan assets that are potentially harmful to the plan" are the kind of transactions prohibited under § 1106(a)(1)(D). --- U.S. at ---- - ----, 116 S.Ct. at 1790-1791. Indeed, the Supreme Court in Lockheed qualified its holding that requiring employees to release all employment-related claims against the employer in exchange for benefits under an early retirement program did not violate ERISA's fiduciary obligations by noting that there was no claim in Lockheed that the employer's "amendments resulted in any violation of the participation, funding or vesting requirements of ERISA." Id. at ---- n. 5, 116 S.Ct. at 1790 n. 5. Thus, the Supreme Court in Lockheed suggested that, where there is an allegation that payment of benefits is "a sham transaction, meant to disguise an otherwise unlawful transfer of assets to a party in interest, or involved a kickback scheme," such allegation is sufficient to state a claim under § 1106(a)(1)(D). Id. at ---- n. 8, 116 S.Ct. at 1792 n. 8.
 
 
 77
 Reading the complaint as a whole and drawing all reasonable inferences in favor of plaintiffs, we find that plaintiffs' allegations also support a claim for relief under the "sham transaction" theory recognized in Lockheed. In essence, plaintiffs allege that Hughes's "amendment" of the Contributory Plan was a sham transaction used to accomplish the unlawful transfer of the Contributory Plan's asset surplus attributable to employee contributions. The alleged transfer may be unlawful because, under the anti-inurement and nonforfeiture provisions, Hughes was prohibited from using the asset surplus attributable in part to employee contributions for its own benefit and the benefit of new employees who were never participants in the Contributory Plan. Assuming that plaintiffs can prove that Hughes's "amendment" resulted in an unlawful use of plan assets, we find that Hughes's alleged conduct constitutes a prohibited transaction under 29 U.S.C. § 1106(a)(1)(D).Sixth Claim
 
 
 78
 Plaintiffs' sixth claim alleges that the defendants violated ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D), which provides that the plan fiduciaries must carry out their duties "in accordance with the documents and instruments governing the plan." According to plaintiffs, Hughes used Contributory Plan assets to provide eligible employees with an early retirement program. Plaintiffs contend that the early retirement program offered benefits in a discriminatory manner to only a select group of participants in violation of Article V, § 5.2 of the Plan. This section provides that the "Plan shall be administered, interpreted and applied fairly and equitably and in accordance with the specified purpose of the Plan."
 
 
 79
 Although the Supreme Court in Lockheed held that using surplus assets attributable solely to employer contributions to fund an early retirement program does not violate ERISA, this holding does not mean that the use of plan assets attributable to employee contributions to fund an early retirement program also does not violate ERISA. As discussed above, we do not think that an employer can unilaterally decide to use plan assets attributable to employee contributions without implicating ERISA's fiduciary obligations. Whether Hughes's conduct in this case actually violated the provisions of the plan raises questions of fact which we cannot resolve on a 12(b)(6) motion. Thus, we find that plaintiffs have stated a claim under 29 U.S.C. § 1104.
 
 C. Procedural Errors
 
 80
 Plaintiffs additionally argue that the Arizona district court abused its discretion by transferring the action to the Central District of California. We review a district court's decision to transfer an action pursuant to 28 U.S.C. § 1404(a) for an abuse of discretion. See Lou v. Belzberg, 834 F.2d 730, 739 (9th Cir.1987), cert. denied, 485 U.S. 993, 108 S.Ct. 1302, 99 L.Ed.2d 512 (1988).
 
 
 81
 Plaintiffs correctly note that a plaintiff's choice of forum is accorded great deference in ERISA cases. See Dugan v. M & W Dozing & Trucking, Inc., 727 F.Supp. 417, 419 (N.D.Ill.1989). However, this deference is one of several factors a court must consider when ruling on a motion to transfer venue. Under Decker Coal Co. v. Commonwealth Edison Co., 805 F.2d 834, 843 (9th Cir.1986), the district court must consider: (1) the relative convenience of the selected forum and the proposed forum; (2) the possible hardship to the plaintiff if the court grants the motion; (3) the interests of justice; and (4) the deference to be accorded the plaintiffs' choice of forum. In applying these factors to the instant case, we cannot say that the Arizona district court abused its discretion in concluding that a transfer of venue was proper.
 
 
 82
 Finally, plaintiffs argue that after the case was transferred to California, it was wrongly reassigned to Judge Gadbois. The case was initially assigned to Judge Consuelo Marshall, but was transferred to Judge Gadbois because it allegedly presented issues similar to those in another case previously heard by him. Plaintiffs contend that the instant case did not qualify as a "related case" transfer. While it may be that the instant case has little in common with the prior case, we are required to accord broad deference to a court's interpretation of its local rules. See United States v. Mouzin, 785 F.2d 682, 695 (9th Cir.1986), cert. denied sub nom., Carvajal v. United States, 479 U.S. 985, 107 S.Ct. 574, 93 L.Ed.2d 577 (1986). The district court did not abuse its discretion in transferring this case from Judge Marshall to Judge Gadbois.
 
 CONCLUSION
 
 83
 The district court erred in dismissing plaintiffs' complaint under rule 12(b)(6). Neither the district court nor the dissent applied the 12(b)(6) standard correctly. At the pleading stage before discovery, all allegations must be liberally construed and taken as true, and all inferences must be drawn in favor of the plaintiff. Applying this standard, we conclude that this complaint alleges cognizable causes of action under ERISA. We, therefore, reverse and remand this case for further proceedings consistent with this opinion.
 
 
 84
 REVERSED AND REMANDED.
 
 WILLIAM A. NORRIS, Circuit Judge, dissenting:
 
 85
 Plaintiffs-appellants are five retired Hughes Aircraft Company employees who are receiving retirement benefits under the Hughes Non-Bargaining Retirement Plan (the "Plan" or "Hughes Plan").[1] The five plaintiffs are among the 10,000-plus Hughes employees and retirees participating in the Plan. The principal relief plaintiffs seek is a termination of the Hughes Plan and a distribution of its assets to participants, such as the plaintiffs, who have made contributions to the Plan.
 
 
 86
 Plaintiffs allege that, largely as a result of "investment growth," Plan assets grew to the point that they exceeded the actuarially projected value of Plan liabilities by approximately $1 billion. In the event that plaintiffs succeed in their quest for a judgment terminating the Plan, ERISA provides for an equitable distribution of the Plan assets to those participants who have contributed to the Plan. Thus, if the Plan is terminated, plaintiffs will receive not only the defined pension benefits which they are currently receiving, but also a share of the $1 billion surplus. That is the pot of gold at the end of the rainbow that drives this litigation.
 
 
 87
 * First Claim: Anti-Inurement
 
 
 88
 In their first claim for relief, plaintiffs contend that Hughes violated ERISA's so-called anti-inurement provision, ERISA § 403(c)(1), 29 U.S.C. § 1103(c)(1),[2]
 
 
 89
 by utilizing excess Plan assets attributable to employer and employee contributions for the sole and exclusive benefit of the employer and to the detriment of plaintiffs and the class they represent.
 
 
 90
 Compl. p 32. The plaintiffs' anti-inurement claim is based on two independent theories. First, they allege that when the Plan accumulated "excess assets," Hughes stopped making contributions to the Plan. As a result, plaintiffs contend, Hughes used Plan assets for its own benefit in violation of § 403(c)(1).
 
 
 91
 This claim is meritless.[3] As the district court correctly noted, the Plan itself imposes an obligation on Hughes to contribute only when necessary to ensure that the Plan is actuarially sound, i.e., sufficiently funded to meet projected liabilities. Judgment, filed Feb. 9, 1993, at p 5(c). Section 3.1 of the Plan provides that:
 
 
 92
 The cost of Benefits under the Plan, to the extent not provided by contributions of Participants ... shall be provided by contributions of [Hughes] not less than in such amounts, and at such times, as the Plan Enrolled Actuary shall certify to be necessary, to fund Benefits under the Plan in accordance with the actuarial assumptions selected by such Actuary from time to time....
 
 
 93
 In addition, section 6.2 of the Plan allows Hughes to "suspend" contributions unless it would thereby cause an "accumulated funding deficiency."[4]
 
 
 94
 ERISA does not require an employer to continue making contributions to an adequately funded plan. In Fechter v. HMW Indus., Inc., 879 F.2d 1111 (3d Cir.1989), the court noted that, although employees were required to continue making contributions,
 
 
 95
 [e]mployer contributions were made only when necessary to keep the Fund actuarially sound, i.e., sufficiently funded. Because the Plan was overfunded, [the employer] did not have to make any contributions for the last five plan years.
 
 
 96
 Id. at 1113; see also LLC Corp. v. Pension Benefit Guar. Corp., 703 F.2d 301, 302 (8th Cir.1983) (noting that terms of pension plan required employee participants to contribute six percent of salary, but required employer to contribute only as much as necessary to fund actuarially determined benefits). The logic underlying this rule was explained in Johnson v. Georgia-Pacific Corp., 19 F.3d 1184, 1190 (7th Cir.1994):
 
 
 97
 Pension law covers bad times as well as good times. In bad times (when declines in the value of assets make plans underfunded) employers must contribute more. If in good times employers were required to distribute the surplus to retirees on the theory that they "owned" that value, outcomes would be asymmetric. Employers would be liable for shortfalls but could reap no benefit from surpluses.
 
 
 98
 The plaintiffs' second anti-inurement theory is that Hughes violated § 403(c)(1) when it amended the Plan in 1991 to add a non-contributory benefit structure. Before this amendment, the Plan operated exclusively through a contributory benefit structure. In other words, under the pre-1991 Plan, all participants were required to make contributions to the Plan fund. Under the non-contributory benefit structure added by the 1991 amendment, participants would not be required to make contributions to the fund but they would receive lesser pension benefits than under the contributory structure. Under the 1991 amendment, existing employees were free to choose between the two benefit structures. Thus, the choice given existing employees was between (1) making contributions and receiving the higher level of defined benefits available under the contributory benefit structure; or (2) making no contributions and receiving lesser benefits under the non-contributory structure. New employees who enrolled in the Plan after the effective date of the 1991 amendment were required to enroll in the non-contributory benefit structure. The 1991 amendment had no effect on the rights of Plan participants, such as the plaintiffs, who had already retired and were already receiving their pensions as defined by the Plan. At all times, Plan benefits were paid out of a single fund, and Hughes' obligation to assure that the Plan was adequately funded remained constant after the 1991 amendment.
 
 
 99
 Nonetheless, plaintiffs argue that Hughes acted for its own benefit by using assets from the "contributory plan" to discharge its obligation to fund benefits under the "non-contributory plan." This argument is meritless. The 1991 amendment did not create a separate pension plan; it merely added an alternative benefit structure under the existing Plan.[5] In amending the Plan to add the non-contributory benefit structure, Hughes acted in its capacity as a settlor, not as a fiduciary. It is well-settled that an employer's decision to amend a pension plan is an exercise of plan design, which does not implicate the employer's fiduciary duties. This principle was recently confirmed in Lockheed Corp. v. Spink, --- U.S. ----, ----, 116 S.Ct. 1783, 1789, 135 L.Ed.2d 153 (1996) ("When employers [adopt, modify, or terminate a pension plan], they do not act as fiduciaries, but are analogous to the settlors of a trust.") (citations omitted); see also Siskind v. Sperry Retirement Program, Unisys, 47 F.3d 498, 505 (2d Cir.1995) ("Virtually every circuit has agreed that ... an employer may decide to amend an employee benefit plan without being subject to fiduciary review."); Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1162 (3d Cir.1990) ("[A]n employer's decision to amend or terminate an employee benefit plan is unconstrained by the fiduciary duties that ERISA imposes on plan administration."); Cunha v. Ward Foods, Inc., 804 F.2d 1418, 1432 (9th Cir.1986) (employer's decision to terminate pension plan was a business decision that did not implicate fiduciary duties under ERISA). As a plan settlor, Hughes "decide[s] who receives pension benefits and in what amounts, select[s] levels of funding, adjust[s] myriad other details of pension plans, and may decide to terminate the plan altogether." Johnson, 19 F.3d at 1188. Having these powers, Hughes also has the lesser included power to add a new benefit structure to an existing plan. Cf. Hickerson v. Velsicol Chem. Corp., 778 F.2d 365 (7th Cir.1985), cert. denied, 479 U.S. 815, 107 S.Ct. 70, 93 L.Ed.2d 28 (1986) (holding that conversion from defined contribution, profit-sharing plan to defined-benefit plan did not violate ERISA); Treas.Reg. § 1.414(l )-1(b)(1)(i), 26 C.F.R. § 1.414(l )-1(b)(1)(i) (1995) (providing that, for income tax purposes, pension plan will be considered as "single plan" even if "plan has several distinct benefit structures"). Thus, Hughes' use of Plan assets to fund benefits under the non-contributory benefit structure is unobjectionable under ERISA.
 
 
 100
 Although plaintiffs' theory is less than clear, they seem to be arguing that under § 403(c)(1), Hughes may not use fund assets to pay benefits to Plan participants enrolled under the non-contributory structure as long as a surplus exists, i.e., as long as the Plan is overfunded. Plaintiffs' rationale is that they are entitled to a share of the surplus because it is attributable at least in part to the investment growth on their contributions. This argument has no merit whatsoever. The existence of a surplus does not and cannot possibly serve as a basis for claiming that Hughes violated § 403(c)(1) by paying pension benefits out of fund assets. Using fund assets to pay pension benefits to Plan participants is not only allowed under the anti-inurement provision, it is required. ERISA § 403(c)(1), 29 U.S.C. § 1103(c)(1) ("[T]he assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.").
 
 
 101
 Whether or not a fund is overfunded at a particular point in time is irrelevant under § 403(c)(1). The existence of a "surplus" in a pension fund is nothing more than an actuarial artifact. As plaintiffs themselves explain, a pension plan is "overfunded" at any point in time in which the present value of the Plan's assets exceeds the actuarially determined value of the Plan's liabilities. Appellant's Br. at 5. The only legal significance of a state of overfunding is that Hughes' obligation to pay into the Plan fund is temporarily suspended as long as the condition of overfunding exists. At all times, whether the fund's investment portfolio is prospering or heading south, Hughes' obligation to assure the financial health of the Plan remains constant.
 
 
 102
 It is inconceivable that Congress intended the lawfulness of a plan amendment to turn on whether a "surplus" existed at the time of the amendment. Whether or not a surplus existed is logically irrelevant to the question whether the 1991 amendment adding a non-contributory benefit structure violated ERISA's anti-inurement provision. As written by Congress, § 403(c)(1) requires us to focus on the use the employer makes of pension fund assets, not whether the plan is overfunded. In focusing on the existence of the surplus, both the plaintiffs and the majority ignore the plain language of § 403(c)(1), which restricts the use of fund assets to the payment of pension benefits to plan participants.
 
 
 103
 Plaintiffs also seem to be arguing that § 403(c)(1) prohibits Hughes from using Plan assets to pay pension benefits to new employees (i.e., employees who joined the Plan after the effective date of the 1991 amendment), all of whom were required to enroll under the non-contributory structure. Again, the plaintiffs' rationale seems to be that the surplus is attributable in part to the contributions made by old employees before the effective date of the 1991 amendment. This argument, too, is meritless. There is no basis in § 403(c)(1) or in the Plan itself for distinguishing new employees from old employees in this manner. Both new and old employees are participants in the Hughes Plan, and Hughes is thus required under § 403(c)(1) to use Plan funds to pay pension benefits to both. In essence, plaintiffs are again claiming that Hughes somehow violated § 403(c)(1) when it used Plan funds to pay pension benefits to Plan participants.
 
 
 104
 Finally, plaintiffs seem to be arguing that § 403(c)(1) prohibits Hughes from using Plan funds to pay pension benefits to employees, new or old, enrolled under the non-contributory structure. This argument is also without merit. In order to make sense of their argument, the plaintiffs must distinguish between two subsets of pre-amendment employees--those who elected to remain enrolled under the contributory structure, and those who elected to switch to the non-contributory structure. The plaintiffs do not, and cannot, draw this distinction. The only difference between these two subsets of old employees is that one group chose to contribute a portion of their paychecks to the fund and receive greater pension benefits in return, while the other group chose to accept a lower level of pension benefits so they could keep their full paychecks for current use. Surely the plaintiffs do not mean to say that § 403(c)(1) prohibits the use of Plan funds to pay benefits to these employees simply because they exercised their option to switch to the non-contributory structure. In sum, I see no basis in § 403(c)(1) or any other provision of ERISA for plaintiffs' argument that ERISA forbids Hughes from using Plan assets to pay pension benefits to all Plan participants, whether enrolled under the contributory or non-contributory benefit structure.
 
 
 105
 Despite the fact that nothing in § 403(c)(1) forbids Hughes from using Plan assets to pay benefits to Plan participants, the majority reverses the district court's § 12(b)(6) dismissal of the action and remands for further proceedings because it finds an unresolved issue of material fact, namely, whether the 1991 amendment to the Plan adding a non-contributory benefit structure effected a termination of the Plan. If the Plan is terminated, then § 4044(d) of ERISA, 29 U.S.C. § 1344(d), kicks in and requires an equitable distribution of the Plan assets after all Plan liabilities are satisfied. If such a distribution were to occur, the named plaintiffs, as retirees who made contributions to the Plan before their retirement, would receive a share of the $1 billion surplus (if it still exists),[6] in addition to the defined pension benefits they are now entitled to.
 
 
 106
 The majority is incorrect in saying that there is a material issue of fact standing in the way of affirming the district court's § 12(b)(6) dismissal of this action. The plaintiffs' quest to have the Hughes Plan terminated and its assets distributed is based on the following facts, none of which is in dispute:
 
 
 107
 1. The Hughes Plan existed as a contributory plan;
 
 
 108
 2. The successful investment of Plan funds resulted in a surplus of $1 billion;
 
 
 109
 3. The Hughes Plan was amended to create a non-contributory benefit structure that was made optional for existing employees and mandatory for new employees;
 
 
 110
 4. The new employees and those existing employees who opted to enroll under the non-contributory structure make no contributions to the Plan fund and receive lesser benefits than existing employees who opt to remain enrolled under the contributory structure; and
 
 
 111
 5. The assets of the Hughes Plan, including any "surplus" that may exist, are used to fund pension benefits under both the contributory and non-contributory benefit structures.
 
 
 112
 The majority does not and cannot disagree that these material facts are undisputed. The "question of fact" that the majority does rely upon to justify a remand is the question whether the amendment terminated the Plan altogether. Opinion at 1294. That, however, is not a question of fact, but a question of law.
 
 
 113
 The record is clear that plaintiffs have alleged all the facts necessary for deciding the legal question of whether ERISA forbids Hughes from amending its contributory pension plan to add a non-contributory benefit structure. The plaintiffs' theory is that Hughes violated the anti-inurement provision of ERISA by creating a new and separate non-contributory plan and using the assets of its contributory plan to discharge its obligations to fund the new plan. In doing all this, plaintiffs argue, Hughes used the assets of the Plan for its own purposes rather than "for the exclusive purposes of providing benefits to the participants of the plan" in violation of § 403(c)(1), 29 U.S.C. § 1103(c)(1), the anti-inurement provision of ERISA, resulting in a termination of the Hughes Plan and an equitable distribution of the surplus pursuant to ERISA § 4044(d), 29 U.S.C. § 1344(d).
 
 
 114
 In accepting plaintiffs' anti-inurement claim as viable, the majority relies upon neither of the two cases the plaintiffs cite in support of that claim, Bridgestone/Firestone, Inc. v. Pension Benefit Guar. Corp., 892 F.2d 105 (D.C.Cir.1989) and Holland v. Amalgamated Sugar Co., 787 F.Supp. 996 (D.Utah 1992), aff'd in part & rev'd in part sub nom. Holland v. Valhi, Inc., 22 F.3d 968 (10th Cir.1994). The majority's omission is understandable since the cases are not on point. Bridgestone and Holland deal with the process of distributing a pension plan's assets under § 4044(d), 29 U.S.C. § 1344(d), once a plan has been terminated. As a result, the cases do not address the antecedent question we are confronted with, which is whether a plan has been terminated in the first place.
 
 
 115
 The majority cites no authority for its holding that plaintiffs' anti-inurement and termination theories are sufficiently viable to survive Hughes' motion to dismiss. It does not claim that either of the cases it cites, Lockheed, --- U.S. at ----, 116 S.Ct. at 1783, and Amato v. Western Union Int'l, Inc., 773 F.2d 1402 (2d Cir.1985), cert. dismissed, 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986), supports its view. Rather, the majority cites these cases only to distinguish them and to claim they do not stand in the way. Both Lockheed and Amato stand for the proposition that an employer does not act in its fiduciary capacity when amending a pension plan, and that a plan amendment adding a new benefit structure does not violate ERISA. The majority attempts to distinguish both Lockheed and Amato on the ground that each involved an amendment to a non-contributory plan, while this case involves an amendment to a contributory plan. However, there is nothing in either the Lockheed or Amato opinion indicating that either holding should be limited to non-contributory plans. In fact, neither Lockheed nor Amato mentions whether the plan at issue was contributory or non-contributory. In other words, there is no basis whatsoever for limiting the precedential value of these cases to non-contributory plans, as the majority does.
 
 
 116
 This contributory/non-contributory dichotomy is the heart of the majority's analysis. The dichotomy, however, is a false one for the purpose of deciding whether Hughes violated ERISA in adding a non-contributory benefit structure to the Plan. There are, of course, contractual differences between the two types of pension plan, as the facts of this case illustrate. Under the contributory benefit structure, the employee makes cash contributions to the Plan and receives greater benefits. Under the non-contributory structure, the employee contributes nothing to the Plan and receives lesser benefits. Either way, the benefits are provided out of a single fund and it is the ultimate responsibility of Hughes to make whatever contributions are necessary to assure that the fund does not accumulate a "funding deficiency." See supra Part I, at 1303. In terms of economic reality, it should make no difference whether an employee makes contributions to a plan directly, or whether the employee makes contributions indirectly through the employer. Either way, the contributions are the economic product of the employee's services.
 
 
 117
 To be sure, there are provisions in ERISA that are designed for the protection of an employee's contributions to a pension plan. An employee's contributions are always nonforfeitable, which means that the employee has a legally enforceable right to recover his contributions with interest, even if he leaves the plan before reaching normal retirement age. ERISA § 203(a)(1), 29 U.S.C. § 1053(a)(1). In addition, if a plan is terminated, participants are entitled to an equitable distribution of the surplus, with each share proportional to the individual participant's contributions, as long as all other plan liabilities are first satisfied. 29 U.S.C. § 1344(d)(3). Except for these protections for employee contributions, ERISA limits an employee's interest in a pension plan fund to his "accrued benefits," which are the benefits defined under the terms of the plan. 29 U.S.C. § 1002(23); see also Johnson, 19 F.3d at 1189 (rejecting retirees' claim that they were entitled to the same benefits increase as active employees when surplus resulted in part from retirees' contributions, reasoning that because "a defined-benefit plan gives current and former employees property interests in their pension benefits but not in the assets held by the trust").
 
 
 118
 The ERISA provisions protecting employee contributions have no bearing on the question whether Hughes violated ERISA in amending its contributory plan to add a non-contributory benefit structure. On this point the majority and I are in sharp disagreement. The majority asserts that the distinction between the two types of pension plans is "critical" to the termination question, but offers no cogent reason why it is "critical" or even relevant. Opinion at 1294. The only authority cited by the majority is §§ 203 and 4044(d)(3)(A) of ERISA, 29 U.S.C. §§ 1053 and 1344(d)(3)(A), which--as discussed above--respectively establish minimum vesting requirements for accrued benefits derived from employee contributions, and provide that in the event a pension plan is terminated, any surplus assets attributable to employee contributions shall be distributed equitably to participants who have made contributions. But how do provisions governing nonforfeiture of accrued benefits, on the one hand, and distribution of assets once a plan is terminated, on the other, help us decide whether a plan has been terminated? The majority's only answer is that the plaintiffs have alleged that the non-contributory amendment resulted in the termination of the contributory plan. Opinion at 1295. If this allegation were an allegation of fact, we would be obliged to accept it as true on this 12(b)(6) motion. But it is not an allegation of fact.[7] It is a conclusion of law. And it is a conclusion of law that cannot be reached except by following the circular path traveled by the majority.
 
 
 119
 To repeat, the majority has ordered a remand because of what it views as an unresolved issue of fact--whether the amendment adding the non-contributory benefit structure resulted in the termination of the Hughes Plan. In my view, and the view of the district court, this is a pure question of law.
 
 
 120
 The majority also views the question whether any benefit Hughes received from the asset surplus was more than "incidental" as a question of material fact that cannot be resolved at the 12(b)(6) stage. Opinion at 1296. The question, however, is beside the point. Whether an employer might realize cost savings from an amendment to a pension plan is not a factor Congress intended courts to consider in deciding whether a pension plan amendment violates ERISA's anti-inurement provision. The focus of our inquiry under ERISA's anti-inurement provision must be whether Hughes used Plan assets for a purpose other than the payment of benefits to Plan participants. The answer to that question is clearly no. The district court's dismissal of plaintiffs' § 403(c)(1) anti-inurement claim should be affirmed.
 
 II
 
 121
 Second Claim: The 1991 Amendment as a Breach of Fiduciary Duty
 
 
 122
 In their second claim, plaintiffs assert that Hughes breached its fiduciary duties under ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A),[8] by "utilizing excess Plan assets attributable to employer and employee participant contributions for the exclusive benefit of defendant Hughes rather than for the benefit of Plan participants and their beneficiaries." Compl. p 34. In their brief, plaintiffs argue that Hughes violated § 404(a)(1)(A) "by expending surplus assets, especially those attributable to employee contributions, not to provide benefits to participants of the Contributory Plan, but rather to participants of the new Non-Contributory Plan whose benefits Hughes is obligated to fund." Appellants' Br. at 14-15 (emphasis in original).
 
 
 123
 Plaintiffs' second claim is not substantively different from their first claim. They merely allege a violation of the general fiduciary duty provision of ERISA, § 404(a)(1)(A), rather than the anti-inurement provision, § 403(c)(1). As such, plaintiffs' second claim is directly foreclosed by Lockheed 's holding that without exception, "[p]lan sponsors who alter the terms of a plan do not fall into the category of fiduciaries." --- U.S. at ----, 116 S.Ct. at 1789. For the reasons stated in connection with plaintiffs' first claim, I do not agree with the majority that the Plan amendments enacted by Hughes implicated ERISA's fiduciary obligations because the Plan was a contributory plan. See Opinion at 1296-97. To repeat, with minor exceptions, ERISA limits an employee's interest in a pension plan fund to his "accrued benefits," which are the benefits defined under the plan. 29 U.S.C. § 1002(23).
 
 
 124
 The district court's dismissal of plaintiffs' § 404(a)(1)(A) claim should be affirmed.
 
 III
 Third Claim: Vesting Requirements
 
 125
 In their third claim, plaintiffs allege that Hughes violated ERISA § 203(a)(1), 29 U.S.C. § 1053(a)(1),[9] "by using assets attributable to employees [sic] ... contributions to meet [its own] funding obligations and [has] therefore caused a divestiture and forfeiture of rights." Compl. p 36. This claim is based upon a misunderstanding of § 203(a)(1), which establishes minimum vesting standards. The purpose of § 203(a) is to guide courts in determining the percentage of an employee's pension benefits that cannot be divested under various circumstances.[10] In short, § 203(a)(1) sets out a vesting schedule that "address[es] the problem of how much to limit an employer's power to withdraw previously offered benefits." Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1160 (3d Cir.1990). This claim also fails.
 
 
 126
 The plaintiffs do not allege that Hughes has ever withdrawn previously offered benefits. They do not allege that the 1991 amendment diminished in any way the defined benefits to which Plan participants enrolled at the time of the Amendment were entitled. In fact, employees active in the Plan before the 1991 amendment's effective date were given the choice between remaining enrolled in the contributory benefit structure and switching to the non-contributory structure. Retired members, all of whom had been enrolled in the contributory benefit structure, continued to receive the same defined benefits they were always entitled to under the Plan.
 
 
 127
 Although plaintiffs continue to receive their defined benefits under the Plan, they argue that the vesting provisions of § 203(a)(1) entitle them to benefits greater than those defined in the Plan. According to plaintiffs, § 203(a)(1) vests them 100% in their "own contributions and what they have earned." Appellants' Br. at 19. The plaintiffs are mistaken. Section 203(a)(1) requires that an employee's rights in the accrued benefit derived from his own contributions be nonforfeitable. 29 U.S.C. § 1053(a)(1) ("A plan satisfies [ERISA's minimum vesting standards] if an employee's rights in his accrued benefit derived from his own contributions are nonforfeitable.") (emphasis added). Nothing in the Plan or ERISA gives plaintiffs an ownership right in the investment return on their contributions. Under both the Plan and ERISA, plaintiffs are entitled to nothing more than their accrued benefits, which are the defined pension benefits they are now receiving. See ERISA § 3(23), 29 U.S.C. § 1002(23) (providing that "accrued benefits" are defined solely by terms of pension plans).
 
 
 128
 The district court's dismissal of plaintiffs' § 203(a)(1) should be affirmed.
 
 IV
 
 129
 Fourth Claim: "Wasting Trust"
 
 
 130
 The plaintiffs' fourth claim is based solely on the theory that the 1991 amendment creating the non-contributory benefit structure somehow had the effect of converting the Plan into a "wasting or dry trust." The plaintiffs do not explain what they mean by the term "wasting trust," nor do they explain how the creation of a non-contributory benefit structure could possibly turn the Plan into a "wasting trust." The plaintiffs' argument in support of this claim is limited to a citation of a single case, In re Gulf Pension Litig., 764 F.Supp. 1149 (S.D.Tex.1991), aff'd on other grounds sub nom. Borst v. Chevron Corp., 36 F.3d 1308 (5th Cir.1994). They make no attempt to show that the two cases share any facts that might be material to their wasting trust theory.
 
 
 131
 In Gulf Pension, the district court described the "wasting or dry trust" doctrine as the principle "[a]t common law [that] if a trust did not state a definite term, it was deemed to last until its purpose was accomplished." Id. at 1202. The court deemed the Gulf Pension plan to have been terminated because all of its purposes had been accomplished. Id. at 1203. The Gulf Pension court explained:
 
 
 132
 [Plan] membership has long been closed and the plans are substantially overfunded as to all future liabilities. The [pension plans] are not accruing significant benefit obligations that could potentially eliminate their surpluses. Nor could the surpluses be used to eliminate or reduce future employer contributions since none have been made since 1970. Therefore, ... delaying termination of the ... trusts would benefit neither the plans nor their participants in the future.
 
 
 133
 Id. at 1204. The Gulf Pension court based its finding that all the trust's purposes had been accomplished on the following facts: Only 2900 active employees and 16,000 retirees were enrolled in the Gulf Pension plan. Id. at 1203. Retired members accounted for 94% of the Gulf Pension plan's liabilities. Id. In addition, most of the active members were nearing retirement, which meant that projected benefits for their future service were "de minimis in relation to the surplus assets in the plans." Id.
 
 
 134
 The plaintiffs allege no facts of the kind relied upon by the Gulf Pension court in finding a "wasting trust." Most notably, plaintiffs do not allege that the Hughes Plan's purposes have been accomplished. Indeed, the only fact alleged in the wasting trust claim is that the Hughes Plan was amended in 1991 to create a non-contributory benefit structure. The plaintiffs do not even attempt to explain why there is any logical connection between the 1991 amendment and their wasting trust theory. All they do is cite Gulf Pension.
 
 
 135
 The majority cites the district court's decision in Gulf Pension in a footnote, contending that plaintiffs' allegations that the 1991 amendment adding a non-contributory benefit structure converted the Plan into a wasting trust survive a Rule 12(b)(6) challenge because the "question of when a termination occurs is a mixed question of law and fact." Opinion at 1295 n. 3. In the view of the majority, the questions of whether the "Contributory Plan's [sic] purposes have been accomplished and whether its liabilities are fixed enough to terminate the plan" are material questions that can only be answered after discovery. Id. at 1296. I disagree. As explained above, I believe that, as a matter of law, the Plan was not terminated by the addition of a non-contributory benefit structure.
 
 
 136
 The district court's dismissal of plaintiffs' wasting trust claim should be affirmed.
 
 V
 
 137
 Fifth Claim: Transfer to a Party in Interest
 
 
 138
 In their fifth claim, plaintiffs argue that use of assets from the "contributory plan" to fund the benefits of participants in the "non-contributory plan" constitutes a use or transfer to Hughes, a party in interest, in violation of ERISA §§ 406(a)(1)(D) & (b)(2), 29 U.S.C. § 1106(a)(1)(D) & (b)(2).[11] The analysis I apply in rejecting plaintiffs' first and second claims is also applicable to the fifth claim. See supra Parts I and II.
 
 
 139
 I would find no violation of § 406 even if Hughes had created two separate pension plans, one contributory and the other non-contributory. Notwithstanding any incidental benefit Hughes might have received from the 1991 amendment, Hughes did not transfer funds to itself as a party in interest. Indeed, the "payment of benefits conditioned on performance by plan participants cannot reasonably be said to [come within the scope of § 406]." Lockheed, --- U.S. at ----, 116 S.Ct. at 1791 (holding that employer did not violate § 406 when it amended its retirement plan to create a new benefits schedule with new conditions for eligibility to be paid for from the plan's asset surplus). Nothing in ERISA prohibits two different benefit structures from being funded from one source. Cf. Holliday v. Xerox Corp., 732 F.2d 548, 551 (6th Cir.), cert. denied, 469 U.S. 917, 105 S.Ct. 294, 83 L.Ed.2d 229 (1984) (holding that transfer of funds from one pension account to another, and subsequent use of transferred funds as setoff in calculating retirement benefits, was permissible under ERISA); Treas.Reg. § 1.414(l )-1(b)(1)(i), 26 C.F.R. § 1.414(l )-1(b)(1)(i) (1995) (providing that, for income tax purposes, pension plan will be considered as "single plan" even if "plan has several distinct benefit structures"). Because the amendment was within Hughes' power as a settlor, see supra Part I, and because Hughes did not transfer assets to itself as a party in interest, I would affirm the district court's dismissal of plaintiffs' fifth claim, which is based on § 406.[12]
 
 VI
 
 140
 Sixth Claim: The Early Retirement Program as a Breach of
 
 Fiduciary Duty
 
 141
 The plaintiffs' sixth claim is based upon a 1989 amendment to the Hughes Plan. In the 1989 amendment, Hughes created an early retirement program which offered improved retirement benefits to some active employees who elected to take early retirement. The 1989 amendment made no changes in the defined benefits that retirees, such as plaintiffs in this action, were already receiving.
 
 
 142
 The plaintiffs claim that, in creating the early retirement program, Hughes violated its fiduciary duties under ERISA § 404(a)(1)(D), which requires plan fiduciaries to carry out their duties "in accordance with the documents and instruments governing the plan...." 29 U.S.C. § 1104(a)(1)(D). The plaintiffs argue that Hughes violated this section because the 1989 amendment discriminated against plaintiffs in providing that Plan assets would be used to fund improved benefits exclusively for those active employees who were made eligible for early retirement. According to plaintiffs, this use of Plan assets contravened Article V, § 5.2 of the Plan, which provides that the "Plan shall be administered, interpreted and applied fairly and equitably and in accordance with the specified purposes of the Plan." The majority acknowledges that, in Lockheed, the Supreme Court held that an employer may amend a retirement plan to offer an early retirement program funded by surplus plan assets without violating ERISA. Nonetheless, the majority holds that plaintiffs have stated a claim under § 404(a)(1) because the assets used to fund Hughes' early retirement program are in part attributable to employee contributions.
 
 
 143
 The majority's holding cannot be squared with Lockheed, nor with cases from two other circuits which have held that pension plan amendments that create retirement windows with incentives for early retirement do not violate § 404(a)(1) of ERISA. Belade v. ITT Corp., 909 F.2d 736, 737-38 (2d Cir.1990); Trenton v. Scott Paper Co., 832 F.2d 806, 809 (3d Cir.1987), cert. denied, 485 U.S. 1022, 108 S.Ct. 1576, 99 L.Ed.2d 891 (1988). These cases emphasize the precept that when an employer amends a plan, just as when an employer first designs a plan, it acts as a settlor and not as a fiduciary. Lockheed, --- U.S. at ----, 116 S.Ct. at 1789; Belade, 909 F.2d at 738; Trenton, 832 F.2d at 809; Johnson v. Georgia-Pacific Corp., 19 F.3d 1184, 1190 (7th Cir.1994) (holding that plan amendment improving benefits for active workers does not violate § 404(a)(1)); see also supra Part I.
 
 
 144
 To distinguish Lockheed, the majority again relies on a purported distinction between contributory and non-contributory benefit structures.[13] Without citing any authority, the majority asserts that it "do[es] not think that an employer can unilaterally decide to use plan assets attributable to employee contributions without implicating ERISA's fiduciary obligations." Opinion at 1302. The majority seems to be saying that employees are co-settlors of contributory plans. The majority, of course, offers no authority for this startling proposition. Moreover, even if we treated employees as settlors of contributory plans, the majority still fails to explain how that makes their ostensible co-settlor, Hughes, a "fiduciary" within the meaning of § 404(a).
 
 
 145
 Although plaintiffs assert that the early retirement amendment "raises all of the same issues presented in" the first five claims, Appellants' Br. at 30, they fail to elaborate any further. I see no violation of any section of ERISA in Hughes' creation of the early retirement program. The district court's dismissal of plaintiffs' claims regarding the 1989 amendment should be affirmed.
 
 CONCLUSION
 
 146
 The majority holds that plaintiffs have stated a claim upon which relief can be granted under ERISA on the theory that Hughes terminated the Plan when it merely amended it to include a non-contributory benefit structure as well as a contributory benefit structure. Thus, the majority clears the way for plaintiffs to continue on their quest for their pot of gold, a share of the $1 billion surplus. If plaintiffs ultimately succeed in obtaining a judgment declaring the contributory plan to be terminated, their pensions will no longer be limited to their "defined benefits." It is understandable that the plaintiffs (and their lawyers) covet the financial gains that resulted from the successful investment strategy that dramatically increased the value of the Plan's assets in the 1980s. But that does not diminish the reality that they have failed to state a legally cognizable claim.
 
 
 147
 Moreover, the majority's decision may have serious adverse consequences for the 10,000-odd participants in the Hughes Plan if this litigation ends in a judicial decree terminating the Plan and distributing the Plan assets. If the Plan continues to run a sizeable surplus as a result of a successful investment portfolio, retirees like the plaintiffs in this action would get a windfall over and above their defined pension benefits. It is not clear, however, where this would leave Plan participants who are still working toward retirement, including those existing employees who opted to remain covered under the contributory benefit structure, those who opted for the non-contributory structure, and the new employees who are enrolled under the non-contributory benefit structure as a matter of plan design.
 
 
 148
 In addition, the unfortunate effects of the majority's decision may extend well beyond the parties in this particular action. Today's decision announces that in the Ninth Circuit there are severe, if vague and ill-defined, restrictions on the discretion of employers charged as plan settlors under ERISA with responsibility for the design of qualified pension plans. Only time can tell what impact these vague and uncertain restrictions will have on employers and their employees.
 
 
 149
 In my view, there is no basis in ERISA, the caselaw, or logic for the majority's decision that in amending its pension plan, Hughes effectively terminated the plan. If ERISA is in need of clarifying or restricting amendments to the provisions relating to the authority of employers as settlors to design pension plans, that need should be addressed by Congress, not this court.
 
 
 
 [1]
 All information in this section is taken from the complaint
 
 
 [2]
 According to plaintiffs, at the time General Motors acquired Hughes, the General Motors retirement plan was underfunded by over seven billion dollars. In fact, the Pension Benefit Guaranty Corporation listed the GM plan as one of the most underfunded pension plans in the country
 
 
 [3]
 Plaintiffs contend that Hughes's conduct here amounts to a constructive termination based on what one circuit has called the dry or wasting trust theory under the law of trusts. See In re Gulf Pension, 764 F.Supp. 1149, 1202 (S.D.Texas 1991), aff'd sub nom, Borst v. Chevron Corp., 36 F.3d 1308 (5th Cir.1994). The Supreme Court recently approved of courts looking to trust principles to construe ERISA provisions. Varity Corp. v. Howe, --- U.S. ----, -----, 116 S.Ct. 1065, 1070, 134 L.Ed.2d 130 (1996). As the Supreme Court stated, "[ERISA's] fiduciary duties draw most of their content from the common law of trust, the law that governed most benefit plans before ERISA's enactment." Id. See also In re Gulf, 764 F.Supp. at 1202 ("[r]esort to the common law of trusts is ... consistent with the underlying purpose of ERISA, which is rooted on the common law of trusts")
 Because ERISA does not define when a termination occurs, we believe it is appropriate for a court to look to trust principles to determine when a termination occurs. Under the common law of trusts, "[o]nce the object of the settlor had been achieved, the trust was deemed to end since its continuation would be useless and might frustrate the intent of the settlor [as] to a beneficiary or remainder interest." In re Gulf, 764 F.Supp. at 1202. See also Wilson v. Bluefield Supply Co., 819 F.2d 457, 464 (4th Cir.1987) (holding that under the law of trusts any remaining assets after a trust's purpose has been fulfilled becomes "a 'resultant trust' for the benefit of the creator of the original trust ... by operation of law unless he manifested a contrary intent").
 We find plaintiffs allegations in this case-that Hughes's conduct in freezing enrollment in the Contributory Plan and creating the Non-Contributory Plan for existing and new employees converted the Contributory Plan into a wasting trust-to be sufficient to survive a 12(b)(6) motion. The question of when a termination occurs is a mixed question of law and fact. See 26 C.F.R. § 1.401-6(b)(1) ("whether a plan is terminated is generally a question to be determined with regard to all the facts and circumstances in a particular case").
 To resolve this question, the record in this case must be further developed. Only after discovery can the district court properly determine whether the Contributory Plan's purposes have been accomplished and whether its liabilities are fixed enough to terminate the plan. See In re Gulf, 764 F.Supp. at 1202-1203. Such a determination may require the help of experts.
 
 
 [4]
 Even if we were to conclude as a matter of law that no termination has occurred here, we find that plaintiffs could still amend their complaint to allege a different theory of recovery. As the Seventh Circuit recently noted in a case involving an employer's decision to amend a pension plan to use surplus assets to increase the benefits of current employee participants without increasing the pension benefits of retired participants:
 A transaction of this kind would reduce the expected value of the benefits. Writing additional promises without increasing the assets available to fund those promises increases the risk that at some time in the future-if, perhaps the economy takes a downturn and ... [the employer] is unable to top up the plan-the trust will be unable to satisfy all of its obligations .... [thus] increas[ing] the risk of non-payment.
 Johnson v. Georgia-Pacific Corp., 19 F.3d 1184, 1187 (7th Cir.1994). The Supreme Court in Lockheed also recognized that "commercial bargains that present a special risk of plan underfunding" are the kind of transactions that ERISA was intended to prohibit. --- U.S. at ----, 116 S.Ct. at 1971.
 In this case, it could very well be that by depleting the Contributory Plan's asset surplus Hughes increased the risk of the Contributory Plan's underfunding. Only through discovery, however, will plaintiffs know whether the expected value of their benefits has been reduced.
 
 
 [5]
 See also Lojek v. Thomas, 716 F.2d 675, 679 (9th Cir.1983) (holding that where employer complies with minimum vesting requirements, "ERISA does not prohibit forfeiture of non-vested benefits in excess of the minimum vesting requirements"); Fentron Industries v. National Shopmen Pension Fund, 674 F.2d 1300, 1306 (9th Cir.1982) (holding that "pension plan may cancel benefits not required by ERISA's minimum vesting requirements")
 
 
 [6]
 Whether plaintiffs in this case are actually entitled to more than the defined benefit amount under the plan requires calculations that raise issues of fact which we cannot decide at the pleading stage
 
 
 [7]
 Termination would not be the only triggering event. Fiduciary obligations of Hughes as trustee would preclude actions short of termination that would threaten compliance with 29 U.S.C. § 1002(23), which requires that an employee's accrued benefit "shall not be less than the amount determined under 1054(c)(2)(B) ... with respect to the employee's accumulated contributions" derived from employee contributions
 
 
 [8]
 Nothing the Supreme Court said in Lockheed and Varity affects our analysis of plaintiffs' claim under 29 U.S.C. § 1053. Neither Lockheed nor Varity construed ERISA minimum vesting and forfeiture requirements. In fact, the Supreme Court in Lockheed specifically noted that "there is no claim in this case that the amendments resulted in any violation of the participation, funding, or vesting requirements of ERISA." --- U.S. at ---- n. 5, 116 S.Ct. at 1790 n. 5
 
 
 [1]
 The plaintiffs seek to represent a class "consisting of all participants of the Plan who are or may become eligible to receive retirement benefits under the Plan." Compl. p 10
 
 
 [2]
 ERISA § 403(c)(1) provides in relevant part:
 [T]he assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.
 29 U.S.C. § 1103(c)(1).
 
 
 [3]
 The majority agrees. However, of all the plaintiffs' varied claims regarding the $1 billion surplus, this is the only one that the majority finds meritless
 
 
 [4]
 "Accumulated funding deficiency" is defined in ERISA as
 the excess of the total charges to the funding standard account for all plan years (beginning with the first plan year to which [ERISA] applies) over the total credits to such account for such years or, if less, the excess of the total charges to the alternative minimum funding standard account for such plan years over the total credits to such account for such years.
 ERISA § 302(a)(2), 29 U.S.C. § 1082(a)(2).
 
 
 [5]
 Exhibits "A" and "B" to the Plan set forth provisions specific to the contributory and non-contributory benefit structures, respectively
 
 
 [6]
 It is possible, of course, that the Plan's investments have declined in value since plaintiffs filed their complaint in 1992, and that the surplus has therefore diminished or disappeared
 
 
 [7]
 The majority leaves us clueless as to how a jury could be instructed to resolve as a question of fact whether the 1991 amendment effected a termination of the Plan
 
 
 [8]
 ERISA § 404(a)(1)(A) provides in relevant part:
 [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan....
 29 U.S.C. § 1104(a)(1)(A).
 
 
 [9]
 ERISA § 203(a)(1) provides:
 A plan satisfies the requirements of [ERISA's minimum vesting standards] if an employee's rights in his accrued benefit derived from his own contributions are nonforfeitable.
 29 U.S.C. § 1053(a)(1).
 
 
 [10]
 For example, § 203(a) applies when an employee becomes disabled, Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981); when an employee has a break in service to a company, Bolton v. Construction Laborers' Pension Trust, 954 F.2d 1437 (9th Cir.1991); when a noncompetition forfeiture clause applies, Clark v. Lauren Young Tire Ctr. Profit Sharing Trust, 816 F.2d 480 (9th Cir.1987); or when an employee dies, Hernandez v. Southern Nevada Culinary & Bartenders Pension Trust, 662 F.2d 617 (9th Cir.1981)
 
 
 [11]
 ERISA § 406(a)(1)(D) provides:
 A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect ... transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan....
 29 U.S.C. § 1106(a)(1)(D). ERISA § 406(b)(2) provides:
 A fiduciary with respect to a plan shall not ... in his individual capacity or in any other capacity act in any transaction involving the plan on behalf of a party ... whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries....
 29 U.S.C. § 1106(b)(2).
 
 
 [12]
 Plaintiffs make no allegations of fact to support their claim that Hughes' amendment of the plan was a "sham transaction" meant to disguise an otherwise unlawful act. They merely allege "sham" in a conclusory fashion
 
 
 [13]
 The only valid distinctions between contributory and non-contributory benefit structures are discussed supra in Part I, at 1307